**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 00-6132-CIV-MORENO/Dube

SARAH ALEXANDRA ROTHMAN,

      Plaintiff,

v.

HUMANA INC.,

      Defendant.

_____/

FILED by ___ D.C.
INTAKE

: : 2 : :.

CLARENCE MADDOX
CLERK U.S. DIST' CT.
S.D. OF FLA.- MIAMI

---

**NOTICE OF MOTION PENDING BEFORE THE JUDICIAL PANEL ON**
**MULTIDISTRICT LITIGATION AND MOTION FOR STAY PENDING**
**RESOLUTION OF MOTION TO TRANSFER AND CONSOLIDATE**
**FOR PRETRIAL PROCEEDINGS**

Defendant Humana Inc., through counsel, hereby notifies this Court that on December 16,

1999, it filed a motion to the Judicial Panel on Multidistrict Litigation (the "MDL Panel") for an order

(a) transferring four virtually identical purported class actions to a single district court and (b)

consolidating those actions for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

Humana's MDL motion, accompanying memorandum, and the amended complaint in *Price v.*

*Humana Inc.*[1] are attached hereto at Tabs 1-3.

On January 28, 2000, Humana Inc. and Humana Health Plan, Inc. notified the MDL

Panel pursuant to Rule 7.4(a) of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation that they considered *Shane v. Humana Inc.* and *Weinger v. Humana Inc.* to be "tag-along"

---

[1] *Price v. Humana Inc.* was the first of 15 virtually identical actions filed against Humana that the MDL Panel is now
considering for consolidation. The complaints in the other 14 cases are substantially similar to the *Price* complaint.

Case No. 00-6132-Civ-Moren/Dube

actions. Accordingly, they asked the MDL Panel to include these additional cases in any consolidation it may order as a result of Humana Inc.'s pending motion before the Panel. Humana Inc. and Humana Health Plans' notice of "tag-along" actions is attached at Tab 4. On February 8, 2000, Humana Inc. notified the MDL Panel of an additional seven cases, including this one, that it considered to be "tag-alongs." A copy of that notice is attached at Tab 5. Furthermore, on March 15, 2000, Humana Inc. notified the MDL Panel that it considered *Cutler v. Humana Medical Plan, Inc.* and *Landa v. Humana Medical Plan, Inc.* to be "tag-along" actions as well. A copy of that notice is attached at Tab 6.

Given the nearly identical allegations in these actions and the likely complexity of discovery, class certification briefing, and other pretrial proceedings, Defendant expects the MDL Panel to grant its motion. (Indeed, none of the plaintiffs in the many affected cases has opposed consolidation.) This litigation is still at a very early stage before both this Court and the other district courts hearing the related actions. A stay of proceedings would therefore help achieve the objectives of the MDL process – namely, judicial economy and the avoidance of inconsistent pretrial rulings – without unduly interfering with any motions pending before this Court. Similar motions were granted by the U.S. District Courts of the Northern District of Illinois in *Johnson v. Humana Inc.*, the Southern District of Mississippi in *Landry v. Humana Inc. and Humana Health Plan* and the Southern District of Florida in *Weinger v. Humana Inc.*. Those orders are attached at Tabs 7-9.

Accordingly, Defendant hereby moves before this Court for a stay of proceedings pending the MDL Panel's decision whether and where to transfer this action for consolidated pretrial proceedings.

2

Case No. 00-6132-Civ-Moren/Dube

This Motion is based on the Memorandum of Law in Support of Motion for Stay of Proceedings filed this day, the pleadings and papers on file herein, and upon such other matters as may be presented to the Court at the time of hearing.

Respectfully submitted,

ADORNO & ZEDER, P.A.

Henry N. Adorno
Fla. Bar No. 160203, hna@adorno.com
Raoul G. Cantero, III
Fla. Bar No. 552356, rgc@adorno.com
2601 South Bayshore Drive, Suite 1600
Miami, Florida  33133
Phone:  (305) 858-5555
Fax:     (305) 858-4777

and

Jones Foster Johnston & Stubbs
505 S. Flagler Drive, Suite 1100
P.O. Box 3475
West Palm Beach, FL  33402-3475

and

O'Melveny & Myers
555 13th Street NW, Ste 500 West
Washington, DC 20004-1109

Case No. 00-6132-Civ-Moren/Dube

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served by mail this 24th day of

March, 2000, upon:

Andrew B. Peretz
Barrett, Gravante, Carpinello & Stern
One E. Broward Boulevard, Suite 620
Ft. Lauderdale, FL 33301



4

ATTACHMENT / EXHIBIT

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE HUMANA INC.                    )
MANAGED CARE LITIGATION )

MDL Docket No. _____

## MOTION OF HUMANA INC. TO TRANSFER AND CONSOLIDATE
## FOR PRETRIAL PROCEEDINGS

Defendant Humana Inc. ("Humana") hereby respectfully moves the Judicial Panel

on Multidistrict Litigation for an order (a) transferring four virtually identical purported class

actions, pending before four different federal district courts, to a single district court, and (b)

consolidating those actions for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.  A

list of the four pending actions is attached hereto as Schedule A.  Humana respectfully suggests

this Panel transfer the pending actions to the Western District of Kentucky.

In support of the transfer and consolidation of these actions, the movant avers the

following, as more fully set forth in the accompanying supporting memorandum:

1.    The four actions for which transfer and consolidation is proposed allege

claims involving managed care practices which have long been recognized as legitimate in the

federal and state laws and regulations governing managed care organizations. In particular,

plaintiffs challenge Humana's practice of utilization review, which ensures the provision of

medically necessary health care in a fiscally responsible manner, and attack its provision of

financial incentives to encourage physician providers to provide care in a cost-effective manner

Plaintiffs do not allege that they have suffered any injury as a result of any deprivation of health

care, nor do they allege that they have ever either requested health care services or been refused

such services. All four actions purport to be brought on behalf of a nationwide class of

individuals covered by Humana policy holders, and/or members of employee benefit plans

served by Humana.

      2.     As required by 28 U.S.C. § 1407(a), the cases proposed for transfer and

consolidation "involv[e] one or more common questions of fact," inasmuch as they are premised

on virtually identical factual allegations with respect to Humana's policies and practices.

      3.     In several respects, the proposed transfer and consolidation "will be for the

convenience of parties and witnesses and will promote the just and efficient conduct" of these

actions. 28 U.S.C. § 1407(a).

      4.     For example, consolidation of the actions before a single court will

eliminate duplicative discovery activity (particularly production of voluminous numbers of

identical documents and multiple depositions of the same witnesses), prevent duplicative and

conflicting pretrial rulings (including determinations with respect to the certification of

substantially overlapping classes), conserve judicial resources, reduce the costs of litigation, and allow the cases to proceed more efficiently to trial.

       5.    Humana respectfully suggests that this Panel transfer these actions to the Western District of Kentucky, which, as the site of Humana's corporate headquarters and the source of many of the witnesses and documents likely to be required for pretrial proceedings, is the center of gravity of this litigation.

       This Motion is based on the Memorandum in Support of this Motion to Transfer and Consolidate filed by Humana this day, the pleadings and papers on file herein, and such other matters as may be presented to the Panel at the time of hearing.

Dated: December 15, 1999

RESPECTFULLY SUBMITTED

Brian D. Boyle
Robert N. Eccles
John H. Beisner
Brian P. Brooks
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 383-5300

<u>Schedule A</u>

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE HUMANA INC.              )
MANAGED CARE LITIGATION )                    MDL Docket No. _____

        Pursuant to Rule 7.2(a)(ii) of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation, defendant Humana Inc. provides the following information on the

actions that will be affected by this motion:

| Complete Name | District Where Pending | Civil Action No. | Judge Assigned |
|---|---|---|---|
| Regina Joi Price, Anthony Sessa, Rey Garcia, Katherine Frisco, Ramon Ortiz Rosano, Emily M. Brown, Arnold Katz and Dawn Yingling on behalf of themselves and all others similarly situated v. Humana Inc. | S.D. Florida, Miami Division | 99-8763-CIV-HURLEY | The Hon. William T.K. Hurley |

| | | | |
|---|---|---|---|
| Sandra Johnson, individually and on behalf of all those similarly situated v. Humana, Inc., a Delaware corporation | N.D. Illinois, Eastern Division | 99C-7602 | The Hon. Marvin E. Aspen |
| Rodney J. Landry and Elizabeth Kempt, on behalf of themselves and all others similarly situated v. Humana Inc. and Humana Health Plan Inc. | S.D. Mississippi, Hattiesburg Division | 2:99cv325PG | The Hon. Charles W. Pickering |
| Donna Messina v. Humana Inc. | S.D. Florida, Miami Division | 99-3309-CIV-DAVIS | The Hon. Edward B. Davis |

## CERTIFICATE OF SERVICE

I hereby certify that Defendant Humana Inc.'s Motion to Transfer and Consolidate and Memorandum in Support of Motion to Transfer and Consolidate, with supporting exhibits, was mailed, postage pre-paid, on December 15, 1999 to the clerk of each district court in which an action is pending that will be affected by the Motion, and to the following counsel of record:

Michael B. Hyman, Esq.
Anthony C. Valiulis, Esq.
Christopher Stuart, Esq.
William H. London, esq.
Melinda J. Morales, Esq.
Much Shelist Freed Deneberg
Ament & Rubenstein P.C.
200 North LaSalle Street, #2100
Chicago, IL 60606

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

Steven Fineman, Esq.
Robert Eisler, Esq.
David S. Stellings, Esq.
Leiff, Cabraser, Heimann & Bernstein
10 Rockefeller Plaza
12th Floor
New York, NY 10020-1903

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

Jacqueline E. Mottek, Esq.
Leiff, Cabraser Heimann & Bernstein
275 Battery Street
30th Floor
San Francisco, CA 94111

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

Richard F. Scruggs, Esq.
Sidney A. Backstrom, Esq.
Scruggs, Millette, Bozeman & Dent
PO Drawer 1425
Pascagoula, MS 39568

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Ronald L. Motley, Esq.
H. Balir Hahn, Esq.
A. Hoyt Rowell III, Esq.
Ness, Motley, Loadholt, Richardson & Poole
174 East Bay Street, Suite 100
Charleston, SC 29401

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Walter Umphry, Esq.
Keith Kebodeaux, Esq.
Provost Umphry Law Firm LLP
PO Box 4905
Beaumont, TX 77704

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Paul S. Minor, Esq.
Minor and Associates
PO Box 1388
Biloxi, MS 39533

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

John W. Barrett, Esq.
Barrett Law Offices
404 Court Square North
PO Box 987
Lexington, MS  39095

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

Patricia Littleton, Esq.
Attorney at Law
104 W. Calvert
PO Box 907
Marion, IL  62959

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

Gordon Ball, Esq.
Attorney at Law
550 Main Avenue
Nations Bank Center Suite 750
Knoxville, TN  37902

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

James S. Ray, Esq.
Connerton & Ray
1401 New York Avenue, N.W.
10th Floor
Washington, D.C.  20005

COUNSEL FOR PLAINTIFF
SANDRA JOHNSON, ET AL.

Anne E. Hinds, Esq.
Boies & Schiller LLP
2435 Hollywood Boulevard
Hollywood, FL  33020-6629

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

John Eddie Williams, Esq.
Herbert T. Schwartz, Esq.
Williams Bailey Law Firm LLP
8441 Gulf Freeway, Suite 600
Houston, TX  77017-5001

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Joseph C. Langston, Esq.
Langston, Langston,
Michael, Bowen & Tucker
PO Box 787
Booneville, MS  38829

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Hiram Eastland, Esq.
Eastland Law Offices
PO Drawer 1079
Greenwood, MS  38930

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

David O. McCormick, Esq.
David O. McCormick, P.A.
P.O. Drawer 1176
Pascagoula, MS  39568

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

George Chandler, Esq.
Chandler Law Offices
P.O. Box 340
Lufkin, TX  75901

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Michael D. Hausfeld, Esq.
Joseph M. Sellers, Esq.
Margaret G. Farrell, eSq.
Donna Solen, Esq.
Cohen, Milstein, Hausfeld & Toll,P.L.L.C.
1100 New York Aenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

Theodore J. Leopold, Esq.
Ricci, Hubbard, Leopold, Frankel
& Farmer, P.A.
Mellon United National Bank
Tower
1645 Palm Beach Lakes
Boulevard
PO Box 2946
West Palm Beach, FL 33402

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

David Boies, Esq.
Stephen Neuwirth, Esq.
William Savitt, Esq.
Boies & Schiller LLP
80 Business Park Drive, Suite 110
Armonk, NY 10504

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

Richard B. Drubel
Boies & Schiller LLP
26 South Main Street
Hanover, NH 03755

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

Frederick P. Furth, Esq.
Furth, Fahrner & Mason
Furth Bilding, Ste. 1000
201 Samsome Street
San Francisco, CA 94104

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

R.W. Richards, Esq.
Phifer & Richards
P.O. Box 1309
Jacksonville, TX 75766

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Cary Patterson, Esq.
Nix, Patterson & Roach LLP
205 Linda Drive
Dangerfield, TX 75638

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Wayne D. Blackmon, Esq.
5301 Westbard
Bethesda, MD 20816

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Harry Potter, Esq.
100 Congress Avenue, Suite 2100
Austin, TX 78701

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Grant Kaiser
Kaiser & Morrison, PC
440 Louisiana, Suite 1440
Houston, TX 77002

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Andrew B. Peretz, Esq.
Barrett Gravante Carpinello & Stern
One East Broward Blvd. Suite 620
Ft. Lauderdale, Fl. 33301

COUNSEL FOR PLAINTIFF
DONNA MESSINA

Michael Straus, Esq.
Bainbridge & Straus, LLP
2210 2nd Avenue North
Birmingham, AL 35203

COUNSEL FOR PLAINTIFF
DONNA MESSINA

Albert R. Huerta, Esq.
Huerta, Hastings & Allison
920 Leopard
PO Box 23080
Corpus Christi, TX 78403

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

Robert B. Silver, Esq.
Boies & Schiller LLP
80 Business Park Drive
Suite 110
Armonk, New York 10504

COUNSEL FOR PLAINTIFF
REGINA JOI PRICE, ET AL.

Shane F. Langston, Esq.
Langston, Frazer, Sweet & Freese, PA
PO Box 23307
Jackson, MS 39225

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL

Lowry M. Lomax, Esq.
Maples & Lomax, PA
2502 Market Street
P.O. Drawer 1368
Pascagoula, MS 39568

COUNSEL FOR PLAINTIFF
RODNEY J. LANDRY, ET AL.

Paul S. Horwitz
Law Clerk
O'Melveny & Myers LLP

Counsel for Defendant Humana Inc.

ATTACHMENT / EXHIBIT 2

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE HUMANA INC.                    )
MANAGED CARE LITIGATION )                          MDL Docket No. _____

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO
## TRANSFER AND CONSOLIDATE FOR PRETRIAL PROCEEDINGS

Petitioner Humana Inc. ("Humana") respectfully submits this memorandum in support of its motion to (a) transfer four virtually identical purported class actions, pending before four different federal district courts, to a single district court, and (b) consolidate those actions for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.[1]

These actions fit perfectly the statutory prerequisites for transfer and consolidation: (1) they "involv[e] one or more common questions of fact," being substantially similar actions filed contemporaneously in far-flung districts; (2) transfer will further "the convenience of the parties and witnesses"; and (3) transfer "will promote the just and efficient conduct of [the] actions" by ensuring centralized oversight of pretrial fact development in what

---

[1]     A detailed list of information about the four cases is attached as Schedule A to Defendant's Motion to Transfer and Consolidate, filed herewith. As noted below, copies of the complaints in each of the four actions have been submitted as exhibits to this memorandum.

are likely to be highly complex and document-intensive actions, and so minimizing waste and inefficiency in the conduct of discovery. 28 U.S.C. § 1407(a). In light of the location of Humana's corporate headquarters, and thus of many of the witnesses and documents that will be the subject of pretrial proceedings, Humana respectfully recommends that actions be transferred to the Western District of Kentucky.

## BACKGROUND

According to one of the lead plaintiffs' counsel in these actions, these four actions are the vanguard of a host of actions against the nation's managed health care providers.[2] Another lead plaintiffs' counsel suggests that the litigation has been filed with the apparent intention of either usurping the role of Congress and the state legislatures by crafting new standards for the managed care industry, or driving the nation's managed care insurers to the brink of bankruptcy.[3] The broad-based, legislative character of this multiplicitous litigation is revealed by the fact that none of the plaintiffs in any of the four actions alleges any injury as a result of the denial of care. Indeed, the plaintiffs in these actions do not allege that they have ever been refused coverage for any medically necessary care whatsoever.

The four complaints filed against Humana thus far are:

- *Price v. Humana, Inc.*, No. 99-8763 Civ-Hurley, amended complaint filed on November 10, 1999, in the United States District Court for the Southern District of Florida (Amended Complaint attached as Exhibit 1).

---

[2]     *See* Alissa J. Rubin and Henry Weinstein, *HMOs Hit With Class-Action Suits*, L.A. Times, Nov. 24, 1999, at A1 (noting that one group of lawyers collaborating on anti-HMO litigation "is planning to file as many as eight more lawsuits in the coming weeks against managed-care companies."). Such lawsuits, if they are filed, presumably would be appropriate candidates for "tag-along" cases in an MDL proceeding.

[3]     *See* Owen Ullman, *Coalition of Lawyers Sues 5 Major HMOs*, USA Today, Nov. 24, 1999, at 15A ("[Richard] Scruggs said that without a settlement ratified by Congress, 'these companies are going to be driven broke by litigation ultimately . . . .'"); Matthew Kauffman and Andrew Julien, *HMO Suits Face Uphill Battle*, Hartford Courant, Oct. 10, 1999, at A1 ("'Our class action is designed to transform the entire system' . . . . 'It's a public policy argument in many ways' . . . . 'These things should be handled legislatively, but there doesn't seem any way the Congress is going to agree on a measure that addresses these concerns.'") (comments of Richard Scruggs)

- *Landry v. Humana Inc. and Humana Health Plan Inc.*, No. 2:99cv325PG, filed on November 22, 1999, in the United States District Court for the Southern District of Mississippi (Complaint attached as Exhibit 2).

- *Johnson v. Humana, Inc.*, No. 99C-7602, filed on November 23, 1999, in the United States District Court for the Northern District of Illinois (Complaint attached as Exhibit 3).

- *Messina v. Humana Inc.*, No. 99-3309-CIV-DAVIS, filed on December 7, 1999, in the United States District Court for the Southern District of Florida (Complaint attached as Exhibit 4).

Each complaint is brought as a class action, on behalf of some variant of "all persons in the United States who purchased or participated . . . in health maintenance organizations ('HMOs') preferred provider organizations ('PPOs') and/or point of service plans ('POSs'), operated by Defendant Humana, Inc." (*Price* Compl. ¶ 1; *see also Johnson* Compl. ¶ 1; *Landry* Compl. ¶ 3; *Messina* Compl. ¶ 1.) Each complaint further proposes a subclass of individuals who participated in Humana health care plans through their employer-sponsored employee benefit plans. (*Johnson* Compl. ¶ 2; *Landry* Compl. ¶ 3; *Price* Compl. ¶ 3; *Messina* Compl. ¶ 2.) All four actions are brought under both the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001-1169.

Each action mounts a remarkably similar attack on Humana's methods of medical care cost containment, which are standard methods in the managed care industry. The plaintiffs in the various actions accuse Humana of "entering into risk-sharing arrangements with physicians, including without limitation so-called 'capitated payment' arrangements, that provide financial incentives and disincentives to treating physicians for not prescribing or recommending treatment for class members." (*Landry* Compl. ¶ 76(e); *see also Price* Compl. ¶ 51(e)(i)

3

(virtually identical language); *Johnson* Compl. ¶ 46(e)(i) (virtually identical language); *Messina*

Compl ¶ 48(b)(5) (virtually identical language).) They further contend that "Humana concealed

from Class Members that it has established a set of financial incentives for claims reviewers

designed to encourage denial of claims without regard to the medical needs of patients." *(Price*

Compl. ¶ 6; *see also Johnson* Compl. ¶ 6 (identical language); *Messina* Compl. ¶ 6 (virtually

identical language); *Landry* Compl. ¶ 7.) Each complaint contends that Humana has fraudulently

misrepresented to its subscribers that "its coverage and treatment decisions are made on the basis

of 'medical necessity'." (*Landry* Compl. ¶ 7; *see also Price* Compl. ¶ 7; *Messina* Compl. ¶ 5;

*Johnson* Compl. ¶ 7.) In particular, all four actions launch a broad attack on Humana's practice

of contracting with specialized entities that conduct "utilization review" – a recognized practice

of monitoring health care procedures and costs in order to ensure that physicians provide

medically necessary care in a fiscally responsible manner. (*Landry* Compl. ¶ 76; *Johnson*

Compl. ¶¶ 8-9; *Price* Compl. ¶¶ 8-9; *Messina* Compl. ¶¶ 7-8.)

       The actions all paint Humana's practice of managed health care as a violation of

RICO predicated on mail and wire fraud. (*Landry* Compl. ¶¶ 22-23; *Price* Compl. ¶¶ 61-89;

*Johnson* Compl. ¶¶ 54-72; *Messina* Compl. ¶¶ 56-82.) They also allege violations of ERISA

grounded on, *inter alia,* purported breaches of fiduciary duty and failures to disclose. (*Landry*

Compl. ¶¶ 166-76; *Johnson* Compl. ¶¶ 74-103; *Price* Compl. ¶¶ 91-118; *Messina* Compl. ¶¶ 83-

103.) They make these allegations despite the fact that a broad array of federal and state laws

governing managed health care contemplate – and even encourage – the very conduct challenged

in these actions. *See, e.g.,* 42 U.S.C. § 300e(c) (permitting physician risk-sharing arrangements),

Fla. Stat. Ann. § 641.31(31)(d) (West 1999) (to same effect); Tex. Ins. Code Ann. § 20A.18A(e)

(West 1999) (to same effect); Va. Code Ann. § 38.2-3407.10(C) (Michie 1999) (to same effect);

Ind. Code Ann. § 27-13-4-1(a)(3) (West 1999) (to same effect).

As noted above, in none of the four actions do the plaintiffs allege that they suffered any physical injury as a result of a denial of coverage for medically necessary care due to the practices about which they complain. Indeed, *none* of the plaintiffs alleges that he or she was deprived of *any* medically necessary health care services at all – fairly or unfairly, and with or without a resultant injury. Instead, they argue that the difference in value between Humana's health care plans – as allegedly described to them at the time of enrollment – and the type of health care coverage they actually received constitutes a lost "coverage benefit" for which they are allegedly entitled to recover money now. (*Johnson* Compl. ¶¶ 49-52; *Price* Compl. ¶¶ 56-59; *Landry* Compl. ¶ 107; *Messina* Compl. ¶¶ 52-55.)[4]

## ARGUMENT

### I.    THESE ACTIONS ARE APPROPRIATE FOR TRANSFER AND CONSOLIDATION FOR COORDINATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407.

In relevant part, 28 U.S.C. § 1407(a) specifies that this Panel may transfer and consolidate two or more civil cases for coordinated pretrial proceedings upon a determination that (a) the cases "involv[e] one or more common questions of fact," (b) the transfers would further "the convenience of the parties and witnesses," and (c) the transfers "will promote the just and efficient conduct of [the] actions." As Humana explains below, the pending cases clearly meet these criteria and should be transferred and consolidated for pretrial proceedings.

#### A.    The Actions Involve One or More Common Questions of Fact.

The first section 1407(a) requirement – that the cases "involv[e] one or more

common questions of fact" – is plainly met here. Each action comprises a general attack on the array of cost-containment and utilization review procedures relied on by a single defendant, Humana, in order to ensure sound management of claims under its policies. As noted above, the allegations in each of the four actions are virtually identical. Consolidation for the purpose of pretrial proceedings would thus obviate the need for unnecessarily duplicative discovery. Given the common themes presented in each of these "no-injury" class actions, consolidation is highly appropriate. *See, e.g., In re "Factor VIII or IX Concentrate Blood Prod." Prod. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) (common questions of fact regarding defendants' conduct); *In re Alert Income Partners Sec. Litig.*, 788 F. Supp. 1230, 1231 (J.P.M.L. 1992) (common questions of fact concerning alleged misrepresentations and omissions of information); *In re Oil Spill By the "Amoco Cadiz" Off the Coast of France on March 16, 1978*, 471 F. Supp. 473, 478 (J.P.M.L. 1979) (where common questions predominate, first factor favoring consolidation met even where some differing legal theories are present); *In re Litigation Arising From the Termination of Retirement Plan for Employees of Fireman's Fund Ins. Co.*, 422 F. Supp. 287, 290 (J.P.M.L. 1976) (common questions of fact in ERISA litigation).

**B.    Consolidation Will Further the Convenience of the Parties and Witnesses.**

Consolidation of these actions will also meet the second section 1407(a) criterion for consolidation and transfer – that it will serve "the convenience of parties and witnesses." Humana anticipates that the plaintiffs in each action will seek depositions of many of the same individuals, and discovery of a significant number of similar documents, including policies, "marketing materials, including certificates of coverage, member handbooks, member

_____

[4]    Humana, of course, denies that it has concealed any material information from plan members, or that it is

information, and provider information" (*Landry* Compl. ¶ 5), and disclosure documents. (*See, e.g., Price* Compl. ¶ 49.)

Clearly, without consolidation, Humana would be subjected to myriad duplicative discovery demands, and witnesses would face redundant depositions. Consolidation will solve this problem by enabling a single judge to formulate a pretrial program that will minimize witness inconvenience and overall expense. Obviously, the savings in time and expense that will result from consolidation will benefit the plaintiffs as well as Humana. *See, e.g., In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 655 (J.P.M.L. 1981) (transfer would "effectuate a significant overall savings of cost and a minimum of inconvenience to all concerned with the pretrial activities"); *In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978) ("[Plaintiffs] will have to depose many of the same witnesses, examine many of the same documents, and make many similar pretrial motions in order to prove their allegations. The benefits of having a single judge supervise this pretrial activity are obvious."); *In re Sterling Homex Corp. Sec. Litig.*, 405 F. Supp. 314, 315 (J.P.M.L. 1975) ("[W]e are confident that Section 1407 treatment will allow the *Fernon* plaintiffs to experience a net savings of time, effort and expenses through pooling their resources with other plaintiffs in the transferee district who share similar interests.").

### C.    Consolidation Will Promote Just and Efficient Conduct of These Actions.

This case also requires consolidation given the obvious relevance of the third factor considered by this Panel pursuant to 28 U.S.C. § 1407 – whether consolidation will "promote the just and efficient conduct of [the] actions." First, consolidation here will prevent

---

otherwise liable to plan members for supposed lost "coverage benefits" under any legal theory.

duplicative discovery and conflicting pretrial rulings. Second, it will facilitate the consistent

resolution of class action issues. Third, both the complexity of the factual issues involved and

the likelihood of additional substantially identical actions being filed in the near future militate in

favor of consolidation.

1.    ***Consolidation Will Prevent Duplicative Discovery and Conflicting Pretrial Rulings.***

As discussed above, the complaints in these four actions contain virtually

identical factual allegations. Where "an analysis of the complaints reveals a commonality of

factual issues," transfer "is necessary in order to prevent duplication of discovery and eliminate

the possibility of conflicting pretrial rulings." *In re A.H. Robins Co. "Dalkon Shield" IUD

Prods. Liab. Litig.*, 406 F. Supp. 540, 542 (J.P.M.L. 1975). This will benefit the parties and

conserve overtaxed judicial resources. *See also In re Temporomandibular Joint (TMJ) Implants

Liab. Litig.*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994) (centralization "necessary in order to

eliminate duplicative discovery, prevent inconsistent trial rulings, . . . and conserve the resources

of parties, their counsel and the judiciary."); *In re Silicone Gel Breast Implants Prods. Liab.

Litig.*, 793 F. Supp. 1098, 1100 (J.P.M.L. 1992) (same).

Given the common factual questions raised by the parties in each action and the

reliance in each action on substantially the same set of documents, extensive discovery will be

duplicated absent consolidation of the actions. In particular, the depositions of Humana

executives and employees, and of third-party agents such as utilization review companies and

physician provider groups, may be taken multiple times on the same subjects. Moreover, many

of the same pretrial disputes are likely to arise in each case (*e.g.*, issues concerning the nature

and scope of discovery, privilege matters, and determinations regarding class certification)

Consolidation will thus ensure that the parties to these actions are not subject to inconsistent pretrial rulings regarding these various pivotal issues – always a critical consideration in determining whether cases should be consolidated under 28 U.S.C. § 1407. *See In re Cross-Fla. Barge Canal Litig.*, 329 F. Supp. 543, 544 (J.P.M.L. 1971) (consolidation of two actions ordered because "consolidation will eliminate the likelihood of repetitive discovery in [certain] areas, serving the convenience of the parties and witnesses and furthering the just and efficient conduct of the litigation."); *In re Multi-Piece Rim Prods. Liab. Litig.*, 464 F. Supp. 969, 974 (J.P.M.L. 1979) (consolidation necessary "to prevent duplication of discovery and eliminate the possibility of conflicting pretrial rulings concerning these common factual issues"); *In re First Nat'l Bank, Heavener, Okla. (First Mortgage Revenue Bonds) Sec. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) (transfer "necessary, even though only two actions are involved, in order to prevent duplicative pretrial proceedings and eliminate the possibility of inconsistent pretrial rulings.").[5]

### 2.    *Transfer Will Facilitate the Uniformity of Class Action Treatment.*

The fact that the plaintiffs in each of these actions seek certification of overlapping putative classes makes these actions particularly attractive candidates for consolidation by this Panel. The Panel has "consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists." *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975). *See also In re TMJ Implants Litig*, 844 F. Supp. at 1554 ("[c]entralization is necessary in order . . . to prevent inconsistent pretrial rulings (especially with respect to class certifications

---

[5]    In *First National Bank*, the Panel noted that, as in the present case, it is especially "desirable to have a

9

and summary judgments)"); *In re Roadway Express, Inc. Employment Practices Litig.*, 384 F.

Supp. 612, 613 (J.P.M.L. 1974) ("the existence of and the need to eliminate [the possibility of

inconsistent class determinations] presents a highly persuasive reason favoring transfer under

Section 1407"); *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) (transfer

necessary to avoid "pretrial chaos in conflicting class action determinations"); *In re Hawaiian*

*Hotel Room Rate Antitrust Litig.*, 438 F. Supp. 935, 936 (J.P.M.L. 1977) ("[S]ection 1407

centralization is especially important to ensure consistent treatment of the class action issues");

*In re Mutual Fund Sales Anti-trust Litig.*, 361 F. Supp. 638, 639-40 (J.P.M.L. 1973) ("we have

frequently held that the possibility for conflicting class determinations under [Fed. R. Civ. P. 23]

is an important factor favoring transfer of all actions to a single district").

        An examination of the purported classes described in the subject complaints

demonstrates that the proposed classes are not only overlapping, but virtually identical. Thus, in

the *Price* complaint, plaintiffs seek to represent the following classes or subclasses:

> 1) "all persons in the United States who purchased or participated (as
> defined herein) in health maintenance organizations ('HMOs') preferred
> provider organizations ('PPOs') and/or point of service plans ('POSs'),
> operated by Defendant Humana, Inc. at any time during the period from
> October 4, 1995 through and after the date hereof until Humana's
> continuing illegal and wrongful conduct has ceased."
>
> 2) "all persons who participated in Humana Health Plans through their
> employers' ERISA-governed health benefits plans during the period from
> October 4, 1993 through and after the date hereof until Humana's
> continuing illegal and wrongful conduct has ceased."

(*Price* Compl. ¶ 1-2.) The *Price* class definition excludes Medicare or Medicaid members

---

single judge oversee . . . class action issues . . . to avoid duplicative efforts." 451 F. Supp. at 997.

(*Price* Compl. ¶3.) In largely identical language, the *Messina* complaint seeks certification for

the same class and subclass as the *Price* complaint, for the same class period. (*Messina* Compl ¶

1-2 ) The *Johnson* complaint seeks to certify the following classes or subclasses

> 1) "all persons in the United States who are, or were, enrolled in Humana
> Inc.'s health maintenance organizations ('HMOs') preferred provider
> organizations ('PPOs') and/or point of service plans ('POSs') operated by
> Defendant Humana, Inc. at any time during the period from November 22,
> 1995, through and after the date hereof until Humana's continuing illegal
> and wrongful conduct has ceased."
>
> 2) "persons who participated in Humana Health Plans through their
> employers' ERISA-governed health benefit plans during the period from
> November 22, 1993 through and after the date hereof until Humana's
> continuing illegal and wrongful conduct has ceased."

(*Johnson* Compl. ¶ 1-2.) It also excludes Medicare or Medicaid members. (*Johnson* Compl. ¶3 )

The *Landry* complaint seeks certification for the following putative class:

> The class consists of individuals who have paid premiums or subscription
> payments, or on whose behalf such payments have been made, and are or
> were named enrollees in any of Humana's HMOs, PPOs, and POS plans at
> anytime during the class period from November 22, 1995 to the date on
> which the class is certified (the "class" or "class members"). The class
> does not include persons insured by Medicare or Medicaid and also does
> not include defendants' directors, officers and employees. Within this
> overall class, there is further defined a subclass consisting of all persons
> who have been participants or beneficiaries of an employee welfare plan
> (as defined in 29 U.S.C. § 1002(1)) that was administered and/or
> underwritten by defendants from November 22, 1993 to the date on which
> this subclass is certified ("subclass").

(*Landry* Compl. ¶ 3.) A cursory review of these definitions reveals that the only real difference

among them is the chronological scope of the purported class membership.

Humana intends to contest plaintiffs' assertions claims that their claims ought to be afforded class treatment pursuant to the criteria set forth in Fed. R. Civ. P. 23  Because the proposed classes in these actions are virtually identical, the arguments presented both for and against certification will presumably be the same.  Thus, there will be a substantial possibility of inconsistent rulings on class certification and other class action-related issues if these cases are not consolidated.  Given the significant overlap in – indeed, the virtual identity of – the proposed classes in these actions, the parties and the courts would surely benefit from having a single judge oversee the class action issues to avoid duplicative efforts and inconsistent rulings.  *See. e.g., In re Rio Hair Naturalizer Prods. Liab. Litig.*, 904 F. Supp. 1407, 1408 (J.P.M.L. 1995) ("Centralization under Section 1407 is necessary in order to . . . prevent inconsistent pretrial rulings (especially with respect to overlapping class certification requests)"); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 568 F. Supp. 1250, 1251 (J.P.M.L. 1983) (centralization necessary where overlapping class certifications sought in all relevant actions); *In re Cuisinart Food Processor*, 506 F. Supp. at 655; *In re Resource Exploration, Inc., Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980) ("An additional justification for transfer is the fact that most of the actions before us have been brought on behalf of similar or overlapping classes of purchasers of the limited partnerships.").

### 3.    *These Actions Are Sufficiently Complex to Warrant Transfer.*

As noted above, if the well-publicized pronouncements to the press by some of the plaintiffs' counsel in these cases are to be credited, these four actions are only the first salvos in a volley of "no-injury" lawsuits to be filed against Humana and other managed care companies by plaintiffs' counsel.  Even these four actions alone, however, are suitable for

consolidation now. The Panel has stated that where the issues involved are sufficiently complex

and consolidation will prevent the duplication of discovery and pretrial rulings, it will not require

large numbers of pending cases in order to grant consolidation under 28 U.S.C § 1407. *See,*

*e g , In re First Nat'l Bank,* 451 F. Supp. at 996 (two actions consolidated); *In re New Mexico*

*Natural Gas Antitrust Litig.,* 482 F. Supp. 333, 336 (J.P.M.L. 1979) (three actions consolidated);

*In re California Armored Car Antitrust Litig.,* 476 F. Supp. 452, 454 (J.P.M.L. 1979) (three

actions consolidated); *In re Cross-Fla. Barge Canal Litig.,* 329 F. Supp. at 544 (two actions

consolidated); *In re Ironworkers Union Employment Practices Litig.,* 424 F. Supp. 1072

(J.P.M.L. 1976) (four actions consolidated); *In re Ryder Truck Lines, Inc. Employment Practices*

*Litig.,* 405 F. Supp. 308 (J.P.M.L. 1975) (four actions consolidated); *In re Eastern Airlines, Inc.*

*Flight Attendant Weight Program Litig.,* 391 F. Supp. 763 (J.P.M.L. 1975) (two actions

consolidated).

   The pending actions clearly present complex factual issues. As plaintiffs' counsel

have loudly declared, these actions represent nothing less than an effort to supersede the policy

judgments of Congress and the state legislatures with regard to managed care through the burden

of multiplicitous litigation and exorbitant demands for unwarranted money damages.

Furthermore, this Panel has suggested that consolidation is highly appropriate where separate

groups of plaintiffs and lawyers seek the certification of overlapping purported classes even

where there are only a small number of actions. *See, e.g., In re First Nat'l Bank,* 451 F. Supp. at

997 ("Because these [two] actions have been brought on behalf of the same plaintiff class, we

emphasize that it is desirable to have a single judge oversee the class action issues in both actions

to avoid duplicative efforts in this area."); *In re California Armored Car Litig.,* 476 F. Supp. at

454 (parties agree that consolidation of three actions necessary to "eliminate the possibility of

conflicting class determinations and other pretrial rulings"); *In re Eastern Airlines Flight Attendant Weight Program*, 391 F. Supp. at 764 ("Moreover, the need to insure uniform disposition of the competing requests for class designation presents a compelling reason for supervision of these [two] actions in a single district."). In sum, these actions are well-suited for consolidation.

**II.    THIS PANEL SHOULD TRANSFER THESE ACTIONS TO THE WESTERN DISTRICT OF KENTUCKY.**

These actions are presently pending before district courts in three districts: two in the Southern District of Florida, one in the Southern District of Mississippi, and one in the Northern District of Illinois. Because Humana's corporate headquarters, and thus many of the witnesses and documents that will be the subject of pretrial proceedings, are located in Louisville, Kentucky, Humana respectfully recommends that this Panel transfer the subject class actions to the Western District of Kentucky.

This Panel has indicated that, under the language of 28 U.S.C. § 1407(a), one important factor in its determination of where to transfer actions for consolidated multidistrict litigation is the convenience of the parties and witness; with respect to this factor, it will consider such matters as the parties' principal place of business and the location of the documents and witnesses necessary to conduct the pretrial proceedings. *See, e.g., In re Air Crash Disaster Near Coolidge, Ariz., on May 6, 1971*, 362 F. Supp. 572, 573 (J.P.M.L. 1973) (location of documents and anticipated witnesses important to consolidation decision). This factor clearly favors the Western District of Kentucky. Many of the witnesses and most of the documents that are likely to be the subject of the pretrial discovery process in these actions are located at Humana's corporate headquarters in Louisville, Kentucky. Production of Humana documents created and

maintained in Kentucky, and discovery of Humana witnesses residing in Kentucky, will likely be required in these cases. Accordingly, the greatest gains in efficiency, for both the parties and the judiciary, can be achieved if these actions are transferred to the Western District of Kentucky – the obvious "center of gravity" for this litigation. In like circumstances, this Panel has regularly transferred multidistrict litigation to the situs of the defendant's corporate headquarters, or the district where the greatest number of witnesses and documents are likely to be found. *See, e.g., In re Salomon Bros. Treasury Sec. Litig.*, 796 F. Supp. 1537, 1538 (J.P.M.L. 1992) ("Salomon's allegedly illegal activities took place in New York at Salomon's corporate headquarters, and documents and witnesses relating to Salomon's conduct are located there").[6]

While none of the four actions is pending in the Western District of Kentucky, the districts in which they are located are less suitable for transfer in this case. The Southern District of Mississippi is not easily accessible and is not centrally located with respect to the parties and witnesses. *See, e.g., In re Air Crash Near Van Cleve, Miss., on August 13, 1977*, 486 F. Supp. 926, 928 (J.P.M.L. 1980) (despite Mississippi's location as site of air disaster, Panel transferred actions to a court that "would be [a] more centrally located and easily accessible transferee forum than the Southern District of Mississippi."). Indeed, it appears the Panel has assigned only one proceeding to the Southern District of Mississippi under 28 U.S.C. § 1407 in the past three decades. *See In re Progressive Games, Inc., Patent Litig.*, No. 1209, 1998 U.S. Dist. LEXIS 1684 (J.P.M.L. Feb. 10, 1998) (consolidating seven actions in the Southern District of

---

[6]    *See also In re Air Crash Disaster at Sioux City, Iowa, on July 19, 1989*, 128 F.R.D. 131, 132 (J.P.M.L. 1989) (noting that "relevant documents can likely be found within this district at United's headquarters"); *In re Baldwin-United Corp Litig*, 581 F. Supp. 739, 740 (J.P.M.L. 1984) ("many of the parties, potential witnesses and relevant documents are located in the Southern District of New York (where defendant broker dealer firms have their principal offices and headquarters"); *In re Commonwealth Oil/TESORO Petroleum Sec. Litig.*, 458 F. Supp. 225, 230 (J.P.M.L. 1978) ("Furthermore, the corporate headquarters of CORCO and TESORO are located in the Western District of Texas and, as a result, many relevant documents and witnesses are located there.").

Mississippi for coordinated pretrial proceedings); Administrative Office of the United States Courts, Leonidas Ralph Mecham, *Judicial Business of the United States Courts: 1998 Report of the Director* 82 (Table S-21). The Southern District of Florida and the Northern District of Illinois are more accessible than the Southern District of Mississippi, but neither district is the situs of the majority of the documents and witnesses that are likely to be involved in pretrial proceedings, and both districts already face significant caseloads that could slow the pace of this litigation. *See, e.g.,* Administrative Office of the United States Courts, *1998 Federal Court Management Statistics* 90 (table for Western District of Kentucky showing 1,780 cases filed, 1,556 cases pending, with 19-month median time from filing to trial), 101 (table for Northern District of Illinois showing 9,330 cases filed, 8,228 cases pending, with 25-month median time from filing to trial), 162 (table for Southern District of Florida showing 8,148 cases filed, 7,960 cases pending, with 22-month median time from filing to trial) (1999). Accordingly, Humana suggests that the cause of party and judicial efficiency would best be served by transferring these actions to the Western District of Kentucky.[7]

## CONCLUSION

For the foregoing reasons, the consolidation of these putative class actions would further "the convenience of parties and witnesses and [would] promote the just and efficient

---

If this Panel decides that the Western District of Kentucky is not the ideal forum for transfer of this litigation, Humana would also be pleased with the selection of any convenient forum in which the court has both the time and the experience to handle cases of the likely magnitude and complexity of these actions. One possibility is the Eastern District of Louisiana, to which this Panel has sent several matters in recent years. That readily accessible forum is relatively close to two of the districts in which these actions have been filed – the Southern District of Florida and the Southern District of Mississippi. New Orleans could thus serve as a useful central location for pretrial proceedings in these actions. *See, e.g., In re Corn Derivatives Antitrust Litig.,* 486 F. Supp. 929, 931-32 (J.P.M.L. 1980) (transferring action to District of New Jersey where the location of the parties' headquarters gave the litigation "an eastern tilt")

16

conduct of [the] actions." 28 U.S.C. 1407(a). Therefore, Humana respectfully respects that this

Panel enter an order transferring the actions listed in Schedule A of its motion to the Western

District of Kentucky for consolidated and coordinated pretrial proceedings.

Dated: December 15, 1999                          RESPECTFULLY SUBMITTED

John H. Beisner
Robert N. Eccles
Brian D. Boyle
Brian P. Brooks
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 383-5300

DC1 415009 4

17

ATTACHMENT / EXHIBIT __3__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED BY _____ D C

99 NOV 10 PH 4: 18

CARLOS JUENKE
CLERK US CIST CT.
S D. OF FLA - WPB

REGINA JOI PRICE, ANTHONY SESSA,
REY GARCIA, KATHERINE FRISCO,
RAMON ORTIZ ROSARIO,
EMILY M. BROWN, ARNOLD KATZ
and DAWN YINGLING
on behalf of themselves
and all others
similarly situated

              Plaintiffs,

v.

HUMANA INC.,

              Defendant.

Case No. 99-8763 Civ-Hurley
Magistrate Judge Lynch

JURY TRIAL
DEMANDED

AMENDED
COMPLAINT-
CLASS ACTION

TABLE OF CONTENTS

Page

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.    DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.    CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VII.   FACTUAL BACKGROUND COMMON TO ALL CLAIMS . . . . . . . . . . . . . . . 32

       A.    Humana's National Health Care Network . . . . . . . . . . . . . . . . . . . 32

       B.    The State and Local Health Care Networks . . . . . . . . . . . . . . . . . . 35

       C.    Categories of Health Plans Offered by Humana to Members of the Classes . . . . 39

       D.    Disclosures by Humana to Class Members . . . . . . . . . . . . . . . . . . . 41

       E.    Humana's Fraudulent Omissions to the Classes . . . . . . . . . . . . . . . . 42

       F.    Humana's Material Misrepresentations to the Classes . . . . . . . . . . . . . . 43

       G.    Humana Takes Actions that are Inconsistent with the Interests of the Classes . . . . 49

       H.    Humana Operates its Network to Implement and Promote Its Wrongful Scheme . . 52

       I.    Harm to the Classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

VIII.  COUNT ONE (Violation of RICO, 18 U.S.C. § 1961 et seq.) . . . . . . . . . . . . . . . 56

       A.    Overview of RICO Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

       B.    Pattern of Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . 58

       C.    The Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

(1) The National Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

(2) The State and Local Enterprises . . . . . . . . . . . . . . . . . . . . . . 64

D.  Relationship Between the Pattern Racketeering Activity and the Enterprise . . 65

E.  Reliance of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

F.  Benefits of Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

G.  Effects on Interstate Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

H.  Direct Injury and Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

IX.    COUNT TWO (Breach of Disclosure Obligations Under ERISA) . . . . . . . . . . . . . 69

X.     COUNT THREE (Breach of Fiduciary Duty Under ERISA) . . . . . . . . . . . . . . . . . 72

A.  The Duty of Loyalty- ERISA Section 104(a)(1) . . . . . . . . . . . . . . . . . . . . . . 72

B.  Duty to Discharge Responsibilities in Accordance with Plan . . . . . . . . . . . . . 74

Documents -- Section 104(a)(1)(D) of ERISA

C.  Duty to Discharge Duties With Care, Skill and Prudence Section 104(a)(1)(B) . 74

D.  Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XI.    COUNT FOUR (Failure to Provide Benefits Due Under ERISA Plans) . . . . . . . . . 75

XII.   COUNT FIVE (Breach of Fiduciary Duty by Failure to Disclose Incentives Imposed on

Physicians) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

XIII.  DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

3

1.    Regina Joi Price, Anthony Sessa, Rey Garcia, Katherine Nicole Frisco, Ramon Ortiz Rosario, Emily M. Brown, Arnold Katz and Dawn Yingling ("RICO Plaintiffs"), by and through their undersigned attorneys, bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek treble damages under the Racketeer-Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§1961-1968, on behalf of themselves and a class ("the RICO Class") consisting of all persons in the United States who purchased or participated (as defined herein) in health maintenance organizations ("HMOs") preferred provider organizations ("PPOs") and/or point of service plans ("POSs"), operated by Defendant Humana, Inc. at any time during the period from October 4, 1995 through and after the date hereof until Humana's continuing illegal and wrongful conduct has ceased (the "RICO Class Period").

2.    Ramon Ortiz Rosario, Katherine Nicole Frisco, Emily M. Brown, Arnold Katz and Dawn Yingling ("ERISA Plaintiffs") also bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons who participated in Humana Health Plans through their employers' ERISA-governed health benefits plans during the period from October 4, 1993 through and after the date hereof until Humana's continuing illegal and wrongful conduct has ceased ("the ERISA Class Period"). The ERISA Plaintiffs seek coverage-benefits denied by defendant, and restitutionary, injunctive and/or other equitable relief under the Employee Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C.§§ 1001-1169.

3.    The RICO Class consists of all persons who purchased their Humana coverage during the RICO Class Period, not including persons insured by Medicare or Medicaid ("the

4

RICO Class"). The ERISA Class consists of all persons who participated in their Humana coverage through their employers' ERISA-governed health benefits plans ("Benefit Plans"). Plaintiffs allege the following upon information and belief, except as to paragraph 17, pertaining to Plaintiffs' own actions, which are alleged upon personal knowledge.

## I. INTRODUCTION

4.    This case arises from Defendant Humana's systematic and intentional concealment from members in its Health Plans of accurate information about when health care claims will be approved or disapproved, and what criteria and procedures are actually used to determine the extent and type of their coverage.

5.    At issue in this action is whether Humana is liable under existing federal law for, among other things, repeated and continuing fraudulent conduct involving material misrepresentations and misleading omissions in disclosures to Class Members. This action does not challenge the legitimacy or wisdom of "managed care" as a means of delivering health services in the United States.

6.    Humana concealed from Class Members that it has established a set of financial incentives for claims reviewers – including direct cash bonus payments – designed to encourage denial of claims without regard to the medical needs of patients. Indeed, *Humana's incentives encouraged claims reviewers to deny claims or limit hospital admissions regardless whether such claims or admissions satisfied the medical necessity criteria set forth in Humana's Health Plan documents.*

7.    Humana consistently told Class Members that coverage and treatment decisions under Humana policies will be made on the basis of "medical necessity." Contrary to these

5

representations, however, Humana did not provide coverage or review claims solely, or sometimes at all, on the basis of medical necessity, as described to Class Members. Instead, as detailed below, Humana treatment and coverage determinations took account of a variety of concealed cost-based criteria that were different from, and sometimes inimical to, the medical needs of Class Members ("Undisclosed Cost-Based Criteria").

8.     Humana also concealed from Class Members that, in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of Class Members' medical coverage – to third parties. These third parties have based claim approval decisions, in whole or in part, on undisclosed criteria that are in addition to, and sometimes wholly unrelated to, medical necessity.

9.     Humana also concealed from Class Members that Humana provides direct financial incentives to physicians, including, without limitation, capitated payment arrangements, that are intended to reduce the amount of care provided to Class Members, regardless of medical necessity.

10.     In addition, Humana concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and specialization to make claims review determinations. Humana thus failed to inform the Class that decisions respecting medical necessity would be made by persons without the appropriate medical experience or training to recognize medical necessity.

11.     By means of the affirmative misrepresentations and omissions described more fully below, Humana intended to and did provide Plaintiffs and the Classes they represent with health insurance benefits of lesser value than promised. Humana unjustly enriched itself by millions of

dollars at the Classes' expense.

12.    As set forth in detail below, Humana's conduct constituted a pattern of racketeering activity as defined in the Racketeer-Influenced and Corrupt Organizations Act (RICO), and is actionable under RICO. Plaintiffs and the RICO Class thus seek treble damages for the injuries to their property and business that they have sustained as a direct and proximate result of Defendant Humana's unlawful conduct.

13.    As also set forth below, Defendant Humana has violated the disclosure provisions of ERISA, wrongfully denied coverage-benefits, and has breached the fiduciary duties it owes to ERISA Class Members. Pursuant to ERISA, Plaintiffs Ramon Ortiz Rosario, Katherine Nicole Frisco, Emily M. Brown, Arnold Katz, Dawn Yingling and the ERISA Class thus seek both (a) recovery of benefits according to the terms of their plans and (b) equitable relief, including corrective disclosures, as provided by ERISA.

## II. JURISDICTION AND VENUE

14.    This action is brought to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, for the injuries sustained by Plaintiffs and RICO Class Members resulting from violations by the Defendant, as hereinafter alleged, of RICO, 18 U.S.C. §§ 1964(c) and 1962(c). This Court has subject matter jurisdiction over the claims of Plaintiffs and the RICO Class pursuant to 18 U.S.C. § 1964 and 29 U.S.C. § 1331.

15.    This action is also brought under § 502 of ERISA, 29 U.S.C. § 1132 for recovery of coverage-benefits, injunctive and other equitable relief. This Court has subject matter jurisdiction over the claims of the Plaintiffs and the ERISA Class pursuant to § 502(e)(1) of ERISA, 29 USC §1132(e)(1).

7

16.    The activities alleged in this Complaint were carried out, in part, within this District, and the Defendant conducts business within this District, in part, the interstate trade and commerce hereinafter described.  Venue is appropriate.

## III. PLAINTIFFS

17.    (1)    Plaintiff Regina Joi Price is a resident of Palm Beach County, Florida.  At all times relevant hereto, Ms. Price was a member of a Humana Health Plan arranged through her employer, the City of Riviera Beach.

(a)    Ms. Price became employed by the City of Riviera Beach (CRB) on or about January 6, 1986 as a police officer, and currently holds the rank of sergeant.  Ms. Price was offered health insurance coverage, in addition to her salary, as compensation for her services.  CRB arranged for its employees to obtain health benefits only from Humana.  CRB did not arrange for its employees to purchase health benefits from any other insurance company.

(b)    During the relevant period, CRB offered Ms. Price a choice between two different Humana plans, an HMO and a PPO.  She first chose the Humana HMO, in 1986, and later switched to the Humana PPO after her son was denied emergency care.  During her employment by CRB, Ms. Price has paid for her Humana coverage with the value of her services and with salary deductions of approximately $80 a week.

(c)    In 1986, when Ms. Price became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents.  The description of benefits concealed from Ms. Price that Humana actually used additional, more

8

restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage, and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Price has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Price continued and paid for her enrollment in Humana in subsequent years.

(d)    After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Ms. Price realized that the coverage she actually had purchased from Humana is not as valuable as the coverage Humana represented to her.

(e)    Ms. Price continues to be an enrollee of the Humana Health Plan because her employer does not offer any other health insurance coverage as part of the agreed amount of compensation for her employment.

(2)    Plaintiff Richard Anthony Sessa is a resident of Palm Beach County, Florida, who at all times relevant hereto, was a member of a Humana Health Plan through his employer, the City of Riviera Beach.

(a)    Mr. Sessa became employed by the City of Riviera Beach (CRB) as a police officer on or about January 6, 1986. Mr. Sessa was offered health insurance coverage, in addition to salary, as compensation for his services. CRB offered its employees health benefits insured only by Humana. CRB did not offer to its employees health benefits coverage by any

9

other insurance companies.

(b)     During the relevant period, Mr. Sessa was offered a choice between two different Humana plans, an HMO and a PPO. At the time of his employment, in 1986, Mr. Sessa enrolled in the Humana HMO. Since the time of his enrollment in Humana, Mr. Sessa has paid for his Humana coverage with the value of his services to CRB and salary deductions of approximately $30 a week. At this time, Mr. Sessa can obtain employer-sponsored health benefit coverage only from Humana.

(c)     In 1986, when he became a member in the Humana Plan, Mr. Sessa was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under his Humana Health Plan would be provided when his medical claims satisfied the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. Concealed from Mr. Sessa was the fact that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Sessa has not received notice from Humana that his coverage has changed. On the basis of the information about his benefit coverage, Mr. Sessa continued to enroll and pay for membership in Humana's HMO plan in subsequent years.

(d)     After being informed of the misrepresentations and omissions by Humana,

10

Mr. Sessa realized that the coverage he purchased from Humana is not as valuable to him as the coverage Humana had represented to him.

(e)    Mr. Sessa continues to be an enrollee of the Humana Health Plan because his employer has not arranged to provide any other health insurance coverage as part of the agreed amount of compensation for his employment.

(3)    Plaintiff Ray Garcia is a resident of Nueces County, Texas, who at all times relevant hereto, was a member of a Humana Health Plan arranged through his employer, the United States Postal Service (USPS).

(a)    Mr. Garcia became employed by USPS on or about February 10, 1979. Mr. Garcia was offered health insurance coverage, in addition to his salary, as compensation for his services. USPS arranged for its employees to select from three or four health maintenance organizations to provide health benefits.

(b)    Mr. Garcia enrolled in a Humana HMO on or about January 13, 1990. During his employment by USPS, Mr. Garcia has paid for his Humana coverage with the value of his services and salary deductions of approximately $6.38 a week.

(c)    In 1990, when Mr. Garcia became a participant in the Humana Plan, he was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under his Humana Health Plan would be provided when his medical claim satisfies the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. The description of benefits concealed from Mr. Garcia that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to

11

make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Garcia has not received notice from Humana that his coverage has changed. On the basis of the information provided by Humana about his benefit coverage, Mr. Garcia continued and paid for his enrollment in Humana in subsequent years.

(d)    After being informed of misrepresentations and omissions by Humana described in the preceding paragraph, Mr. Garcia realized that the coverage he actually had purchased from Humana is not as valuable to him as the coverage Humana represented to him.

(e)    Mr. Garcia continues to be an enrollee of the Humana HMO but plans to disenroll at the beginning of next year when his contract with Humana terminates.

(4)    Plaintiff Katherine Nicole Frisco is a resident of Nueces County, Texas, who at all times relevant hereto was a member of a Humana Health Plan arranged through her employer, Huerta, Hastings & Allison, L.L.P..

(a)    Ms. Frisco became employed by Huerta, Hastings & Allison, L.L.P. (HHA) on or about June 1994. Ms. Frisco was offered health insurance coverage, in addition to her salary, as compensation for her services. HHA arranged for its employees to obtain health benefits only from Humana. HHA did not offer its employees health benefits from any other insurance companies.

(b)    Ms. Frisco enrolled in a Humana PPO on or about September 1994. During her employment by HHA, Ms. Frisco paid for her Humana coverage with the value of her services

12

and salary deductions of approximately $38 a week. Ms. Frisco's PPO was an employer-sponsored, ERISA-governed employee benefit plan and was offered, in addition to salary, as compensation for her services.

(c)     In 1994, when Ms. Frisco became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when her medical claim satisfies the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms. Frisco that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. During the time of her enrollment in Humana, Ms. Frisco received no notice from Humana that her coverage had changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Frisco continued and paid for her enrollment in Humana in subsequent years.

(d)     After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Ms. Frisco realized that the coverage she actually had purchased from Humana was not as valuable to her as the coverage Humana represented to her.

(e)     Ms. Frisco discontinued her employment with HHA in May 1998 and her

13

enrollment in the Humana Health Plan terminated on or about September 1998.

     (5)    Ramon Ortiz Rosario is a resident of Palm Beach County who at all times relevant hereto, was a member of a Humana Health Plan arranged through his employer, Nical of Palm Beach, Inc. (Nical) (formerly known as Scott Lewis Gardening and Trimming )

     (a)    Mr. Rosario became an employee of Scott Lewis Gardening and Trimming Inc. in or about January of 1987. He currently holds the position of the trimming supervisor with Nical. Mr. Rosario's Humana HMO is an employer-sponsored, ERISA-governed employee welfare plan and was offered, in addition to his salary, as compensation for his services. His employer arranged for its employees to obtain health benefits only from Humana and did not arrange for its employees to purchase health benefits from any other insurance company since on or about September 15, 1995.

     (b)    Mr. Rosario has paid for his Humana coverage with the value of his services and with salary deductions of approximately $20.52 a week.

     (c)    Shortly after he became a member in the Humana Plan, Mr. Rosario received a description of benefits from Humana, which represented, among other things, that claims under his Humana Health Plan would be evaluated under Humana's Medical Necessity Definition. The description of benefits concealed from Mr. Rosario that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives for physicians and other health care professionals to deny coverage; and

14

allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Rosario has not received notice from Humana that his coverage has changed. Mr. Rosario enrolled and continued to pay for membership in the Humana HMO on the basis of the information provided to him about his benefit coverage.

(d)     After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Mr. Rosario realized that the coverage he had purchased from Humana is not as valuable to him as the coverage represented in Humana's documents.

(e)     Mr. Rosario continues to be an enrollee of the Humana HMO because his employer has not arranged to provide any other health insurance coverage.

(6)     Emily M. Brown is a resident of Alexandria, Virginia. From the beginning of the ERISA and RICO Class Periods through the end of 1996, Ms. Brown was a member of a Humana Health Plan arranged through her employer, Divorce and Marital Stress Clinic, Inc, trading as Key Bridge Therapy and Mediation Center. During her employment with Key Bridge Therapy and Mediation Center, Ms. Brown paid her Humana coverage with salary deductions of approximately $175 per month.

(a)     Ms. Brown's Humana Health Plan was an employer-sponsored, ERISA-governed employee welfare plan offered by Key Bridge Therapy and Mediation Center.

(b)     Key Bridge Therapy and Mediation Center did not offer its employees health benefits coverage by any other insurance companies.

(c)     When Ms. Brown became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when her medical claim

15

satisfies the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms. Brown that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of her enrollment in Humana, Ms. Brown has not received notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Brown continued and paid for her enrollment in Humana.

(d)    After being informed of the misrepresentations and omissions by Humana described in the preceding paragraph, Ms. Brown realized that the coverage she actually had purchased from Humana was not as valuable to her as the coverage Humana represented to her.

(e)    Ms. Brown was dissatisfied with her Humana coverage and discontinued her Humana Health Plan at the end of 1996.

(7)    Arnold Katz is a resident of Broward County, Florida. From on or about 1995 to the present, Mr. Katz has been a member of a Humana Health Plan arranged through his employer, Vencor Hospital.

(a)    Mr. Katz became employed by Vencor Hospital in or about 1995 as a respiratory therapist supervisor. Mr. Katz's Humana Health Plan is an employer-sponsored, ERISA-governed employee welfare plan offered by Vencor Hospital. Mr Katz was offered health

16

insurance coverage, in addition to his salary, as compensation for his services. Vencor Hospital arranged for its employees to obtain health benefits only from Humana. Vencor Hospital did not arrange for its employees to purchase health benefits from any other insurance company

   (b) During the relevant period, Vencor Hospital offered Mr. Katz the choice between two different Humana plans, an HMO and a PPO. Mr. Katz chose the Humana PPO plan. During his employment with Vencor Hospital, Mr. Katz has paid for his Humana coverage with the value of his services and with salary deductions of approximately $56 per two weeks.

   (c) When Mr. Katz became a participant in the Humana Plan, he was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when his medical claim satisfies the Medical Necessity Definition set forth in his Humana policy and other Disclosure Documents. The description of benefits concealed from Mr. Katz that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. Since the time of his enrollment in Humana, Mr. Katz has not received notice from Humana that his coverage has changed. On the basis of the information provided by Humana about his benefit coverage, Mr. Katz continued and paid for his enrollment in Humana.

   (d) After being informed of the misrepresentations and omissions by Humana

17

described in the preceding paragraph, Mr Katz realized that the coverage he actually had purchased from Humana is not as valuable as the coverage Humana represented to him.

(e)     Mr. Katz continues to be an enrollee of the Humana Health Plan because his employer does not offer any other health insurance coverage as part of the agreed amount of compensation for his employment.

(8)     Plaintiff Dawn Yingling is a resident of Anderson, Madison County, Indiana, who at all times relevant hereto was a member of a Humana Health Plan arranged through her employer, New Horizons, Computer Learning Centers, Inc.

(a)     Ms Yingling became an employee of New Horizons in May 1998.  Ms Yingling was offered health insurance coverage, in addition to her salary, as compensation for her services.  Ms. Yingling's  Humana Health Plan is an employer-sponsored, ERISA-governed employee welfare plan offered by New Horizons.  New Horizons arranged for its employees to obtain health benefits only from Humana.  New Horizons did not offer its employees health benefits from any other insurance companies.

(b)     Ms Yingling enrolled in a Humana PPO on or about June 1998. During her employment by New Horizons, Ms Yingling paid for her Humana coverage with the value of her services and salary deductions.

(c)     When Ms Yingling became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage for claims under her Humana Health Plan would be provided when her medical claim satisfies the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents.  The description of benefits concealed from Ms Yingling that Humana actually used

18

additional, more restrictive standards to determine when coverage would be approved and provided. For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created direct financial incentives to claims reviewers to influence claims review decisions; contracted with third parties to perform claims review; created direct financial incentives to treating physicians and other health care professionals to deny coverage; and allowed persons without appropriate training to make claims review decisions. During the time of her enrollment in Humana, Ms Yingling has received no notice from Humana that her coverage has changed. On the basis of the information provided by Humana about her benefit coverage, Ms. Yingling continued and paid for her enrollment in Humana in subsequent years.

(d)    In November 1998, Ms Yingling's physician ordered blood tests be conducted to diagnose a suspected blood clotting disorder, a condition from which her mother had died at the age of 23. Humana denied a claim for the tests stating that "the lab tests were determined to not be medically necessary". After Ms Yingling complained to the Indiana Department of Insurance, Humana partially paid Ms Yingling's claim.

(e)    After being informed of the misrepresentations and omissions by Humana described in subparagraph (8)(c) of this paragraph, Ms Yingling realized that the coverage she actually had purchased from Humana was not as valuable to her as the coverage Humana represented to her.

(f)    Ms. Yingling continues to be an enrollee of the Humana PPO because her employer has not arranged to provide any other health insurance coverage.

19

## IV DEFENDANT

18.   Defendant, Humana Inc. is a Delaware corporation with corporate headquarters in Louisville, Kentucky.   Humana is traded on the New York Stock Exchange.

19.   The majority of Humana's membership is located in 15 states: Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming.   Humana offers health plans and other employee benefit products in at least 38 states, including (in addition to the 15 states listed above), Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.

20.   Since 1983, Humana, through a network of providers, has offered health care services to approximately 6.2 million persons annually. The Company operates health maintenance organizations (HMOs), preferred provider organizations (PPOs) and point of services plans (POSs) that encourage or require the use of providers who have contracted with Humana. Humana contracts with more than 9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

21.   Humana Inc. is the parent corporation of the following subsidiaries that provide underwriting and health care services, including without limitation:

(a)   Humana Health Plans of Alabama, Inc.;

(b)   QuestCare, Inc.;

(c)   Cornerstone Insurance and Financial Services Inc. and West Coast Multiple

20

Servs, Inc.

(d)     Centerstone Holding Corporation;

(e)     EMPHESYS Financial Group, Inc.;

(f)     Health Value Management, Inc.;

(g)     Humana HealthChicago, Inc.;

(h)     Humana Inc. d/b/a H.A.C. Inc. and Humana of Delaware, Inc.;

(i)     Humana Military Healthcare Services, Inc., d/b/a Humana Military Health

        Services, Inc.;

(j)     Medstep, Inc.;

(k)     Physician Corporation of America;

(l)     Delray Beach Health Management Associates, Inc., d/b/a Humana Health

        Care Plans - Delray;

(m)     Family Health Plan Administrators, Inc.;

(n)     Health Inclusive Plan of Florida, Inc., d/b/a Humana Health Care Plans -

        Century Village Palm Beach;

(o)     Humana Health Care Plans - Davie, Inc., f/k/a Coastal Physician Group of

        South Davie, Inc.;

(p)     Humana Health Care Plans - Palm Springs, Inc. f/k/a Coastal Managed

        Care of Lake Worth, Inc.;

(q)     Humana Health Care Plans - Rolling Hills, Inc., f/k/a Coastal Physician

        Group of North Davie, Inc.;

(r)     Humana Health Care Plans - South Pembroke Pines, Inc. f/k/a Coastal

21

Physician Group of Pembroke Pines, Inc.;

(s)    Humana Health Care Plans - West Palm Beach, Inc. f/k/a Coastal Managed Care of West Palm Beach, Inc.,

(t)    Humana Internal Medicine Associates, Inc. f/k/a Coastal Internal Medicine Associates of Dade, Inc., d/b/a: (1) Humana Health Care Plans - Hialeah f/k/a Coastal Internal Medicine Associates of Hialeah; (2) Humana Health Care Plans - South Miami f/k/a Coastal Internal Medicine Associates of Larkin; (3) Humana Health Care Plans- Miami, f/k/a Coastal Internal Medicine Associates of Miami; (4) Humana Health Care Plans - Miami Beach f/k/a Coastal Internal Medicine Associates of Miami Beach, (5) Humana Health Care Plans- Royal Oaks f/k/a Coastal Internal Medicine Associates of Miami Lakes; (6) Humana Health Care Plans - Miami Springs f/k/a Coastal Internal Medicine Associates of Miami Springs; (7) Humana Health Care Plans - Midway f/k/a Coastal Internal Medicine Associates of Midway; (8) Humana Health Care Plans - Boca Raton; (9) Humana Health Care Plans -Delray Harbor; (10) Humana Health Care Plans - Lantana; (11) Humana Health Care Plans - Palm Beach Gardens; (12) Humana Health Care Plans - Tamarac; and (13) Humana Health Care Plans - West Boca.

(u)    Humana Internal Medicine Associates of the Palm Beaches, Inc f/k/a Coastal Internal Medicine Associates of the Palm Beaches, Inc., d/b/a: (1) Humana Health Care Plans - Lake Worth f/k/a Coastal Internal Medicine

22

Associates of JFK Circle; (2) Humana Health Care Plans - Flagler f/k/a Coastal Internal Medicine Associates of Northern Dixie Highway; (3) Humana Health Care Plans - Riverbridge f/k/a Coastal Internal Medicine Associates at Riverbridge; (4) Humana Health Care Plans - Palm Beach f/k/a Coastal Internal Medicine Associates of South Dixie Highway; (5) Humana Health Care Plans - Boynton Beach;

(v)     Humana Health Insurance Company of Florida, Inc.;

(w)     Humana Medical Plan, Inc., d/b/a: (1) Coastal Pediatrics -Daytona; (2) Coastal Pediatrics - Port Orange; (3) Coastal Pediatric - Ormond; (4) Daytona Gastroenterology; (5) Flagler Family Practice; (6) Florida Dermatology Center; (7) Humana Medical Plan - West Palm Beach; (8) Internal medicine of Daytona; (9) Orange Park Family Health Care; (10) St. Augustine Family Health Center; and (11) Suncoast Medical Associates;

(x)     Lakeside Medical Center Management, Inc., d/b/a University Medical Center;

(y)     PCA Options, Inc.;

(z)     Humana Employers Health Plan of Georgia, Inc., f/k/a EMPHASES Healthcare of Georgia, Inc.;

(aa)     Humana Health Direct, Inc., d/b/a Behavioral Health Direct;

(bb)     Humana HealthChicago Insurance Company, d/b/a Goldcare 65;

(cc)     HMPK, Inc.;

23

(dd)   HPLAN, Inc.;

(ee)   Humana Health Plan, Inc.: d/b/a (1) Central Kentucky Family Practice; (2)
Franklin Medical Center; (3) Humana Health Care Plans of Indiana; (4)
Madison Family and Industrial Medicine (KY); and (5) Humana Health
Care Plans - Somerset (KY);

(ff)   Humana Kansas City, Inc., d/b/a: (1) Humana Prime Health Plan;

(gg)   Humana Health Insurance of Nevada, Inc.;

(hh)   Humana Health Plan of Ohio, Inc., f/k/a ChoiceCare Health Plans, Inc.,
d/b/a ChoiceCare/Humana (IL, IN, KY, OH);

(ii)   Humana Insurance of Puerto Rico, Inc.;

(jj)   Humana HMO Texas, Inc.;

(kk)   Humana Health Plan of Texas, Inc., d/b/a: (1) Humana Health Plan of San
Antonio; (2) Humana Regional Service Center; (3) Leon Valley Health
Center; (4) Lincoln Heights Medical Center; (5) MedCentre Plaza Health
Center; (6) Perrin Oaks Health Center; (7) Val Verde Health Center; (8)
West Lakes Health Center; and (9) Wurzbach Family Medical Center;

(ll)   PCA Health Plans of Texas, Inc.;

(mm)   PCA Provider Organization, Inc;

(nn)   CareNetwork, Inc., d/b/a CARENETWORK;

(oo)   Humana Wisconsin Health Organization Insurance Corporation d/b/a: (1)
WHOIC; and (2) WHO;

(pp)   Independent Care, Inc.;

24

(qq)    Network EPO, Inc.; and

(rr)    Wisconsin Employers Group, Inc.

22.    Unless otherwise specified, Humana Inc. and the Humana Health Plans as well as Humana-owned, -operated and/or -controlled entities that offer health insurance are collectively referred to herein as "Humana."

## V DEFINITIONS

23.    As used herein, the following terms are defined as:

(A)    "Health Plan" means a plan that provides or arranges for the provision of medical and other health services and health insurance to employment groups, other affinity groups and individuals.

(B)    "Benefit Plan" means an ERISA-governed employee welfare plan offered by an employer as an employment benefit and provided in exchange for the employee's labor, cash, and/or services.

(C)    "Humana Medical Necessity Definition" means the essential factors set forth by Humana in Health Policies, summary plan descriptions, member handbooks, certificates of coverage, other plan descriptions, notifications of modifications and changes to the plan, and other documents sent to Class Members to describe the circumstances under which Humana will provide health insurance coverage.

According to the Humana Medical Necessity Definition, services and supplies are medically necessary when they are:

1.    consistent with the symptom or diagnosis and treatment of the member's injury or sickness;

2.    appropriate with regard to standards of good medical practice;

3.    not solely for the convenience of a member, physician, hospital or ambulance care facility; and

4.    the most appropriate supply or level of service which can be

25

safely provided to the member. When applied to the care of an inpatient, it further means that the Members' medical symptoms or condition require that the services cannot be safely provided to the member on an outpatient basis.

(D)    "Health Policy" means a contract for the provision of health insurance between an insured and Humana Inc. and/or a Humana Plan.

(E)    "Utilization Policies and Procedures" means those policies and procedures set forth in the Utilization Management Policies and Procedures Manuals approved by Defendant.

(F)    "Undisclosed Cost-Based Criteria" means criteria based in whole or in part on cost considerations, which are used by Humana to determine the medical necessity of treatment for coverage purposes, including but not limited to (i) Interqual Criteria, (ii) Milliman and Robertson Criteria, and (iii) Value Health Sciences, Inc. criteria and guidelines.

(G)    "Disclosure Documents" are documents Humana has delivered or caused to be delivered to Class Members by means of the United States Postal Service concerning the amount, quality and circumstances of care and service offered by Humana Health Plans. These documents include, without limitation, (i) summary plan descriptions; (ii) certificates of coverage; (iii) other plan benefit descriptions mailed to Class Members upon or after their enrollment in a Humana Health Plan; (iv) notifications of Health Plan changes or modifications; (v) penta-annual updated summary plan descriptions.

(H)    "Participant" means (1) any person who is an employee or former employee of an employer that arranged ERISA-governed health benefits for purchase by its employees and (2) who purchased membership in a Humana Health Plan as a participant in such ERISA-governed benefit plan.

(I)    "RICO Class Members" means all persons who purchased memberships or participated in Humana Health Plans individually or as members of employment groups during the RICO Class Period.

(J)    "ERISA Class Members" means all persons whose employment

26

group health benefit plans were governed by ERISA during the
ERISA Class Period.

(K)     "Class Members" means all persons who are members of either the
RICO Class or ERISA Class, or both.

(L)     "The Classes" means the RICO Class and the ERISA Class.


## VI. CLASS ACTION ALLEGATIONS

24.     Plaintiffs Regina Joi Price, Anthony Sessa, Rey Garcia, Katherine Frisco, Ramon
Ortiz Rosario, Emily M. Brown, Arnold Katz and Dawn Yingling bring this action on behalf of
themselves and, under Fed. R. Civ. P. 23(b)(2) and 23(b)(3), as representatives of the RICO
Class, defined as all persons who purchased or participated in Humana Health Plans during the
RICO Class Period. The RICO Class does not include Defendant's directors, officers and
employees. In addition, this action does not seek to remedy claims of personal injury, medical
malpractice and/or wrongful death against Defendant.

25.     Plaintiffs Ramon Ortiz Rosario, Katherine Frisco, Emily M. Brown, Arnold Katz
and Dawn Yingling also bring this action on behalf of themselves and pursuant to Fed. R. Civ. P.
23(b)(2) and 23(b)(3), as representatives of the ERISA Class, defined as all persons who
participate or have participated in an employee welfare plan as defined in 29 U.S.C. § 1002(1)
during the ERISA Class Period. The ERISA Class does not include Defendant's directors,
officers and employees.

26.     Class Members are numerous and joinder is impracticable. Plaintiffs believe that
there are millions of Class Members as above-described. Their exact number and identities is

27

known by the Defendant.

27.    Plaintiffs' claims are typical of the Class Members.  Plaintiffs and Class Members were damaged in the same way by the same wrongful conduct of Defendant.

28.    Plaintiffs will fairly and adequately protect and represent the interests of the Classes.  The interests of Plaintiffs are coincidental with and not antagonistic to those of the Classes.

29.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation.

30.    Questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendant engaged in a pattern of wrongful conduct, by a scheme of material misrepresentations and omissions in documents provided directly and indirectly to Class Members, to fraudulently induce Plaintiffs and Class Members to enroll or remain enrolled in Humana Health Plans;

b.    Whether Defendant knowingly misrepresented to the Class Members, or knowingly permitted misrepresentations to be made on its behalf to the Class Members, that claims for coverage of medical services specified in Humana's Health Policies would be paid if the services met the Humana Medical Necessity Definition;

c.    Whether Humana based coverage determinations on Undisclosed Cost-Based Criteria that are different from or more restrictive than the factors included in the Humana Medical Necessity Definition;

d.    Whether Humana concealed from Class Members that it has established a set of direct financial incentives to claims reviewers that encourage claims reviewers to deny

claims without regard to the medical needs of patients.

e    Whether Humana fraudulently omitted to disclose to the Classes that in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of Class Members' medical coverage – to third parties, who have based claim approval decisions, in whole or in part, on undisclosed criteria, with the purpose of limiting the circumstances when Humana would approve treatment or claims;

f.    Whether Humana concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and specialization to make claims review determinations;

g.    Whether Humana concealed from Class Members its use of capitation arrangements with physicians.

h.    Whether Humana retained the benefits of the above alleged practices which otherwise would have belonged to Class Members;

i.    Whether the value of the Humana Policies as represented was more than the value of the policies as implemented; and

j.    Whether Humana intentionally, recklessly or negligently damaged and irreparably harmed Plaintiffs and Class Members by the conduct described herein;

31.    Questions of law and fact common to the RICO Class include, but are not limited to:

a.    Whether Humana conducted the affairs of an enterprise through a pattern of racketeering activity as defined in RICO;

29

b.    Whether Humana participated in the operation and management of both a national health care network and state and local health care networks, consisting of Humana, the Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health agencies;

c.    Whether the property and business of the RICO Class was directly and proximately injured within the meaning of § 1964 of RICO, as a result of Humana's racketeering activities and predicate acts consisting of a wrongful scheme intended to defraud the RICO Class, and involving use of the United States mail and interstate wire services in furtherance of that scheme to disseminate to the RICO Class advertising materials, Health Policies, benefit descriptions, claims forms, and letters misrepresenting and omitting to disclose the coverage provided by Humana policies in violation of RICO;

d.    Whether Humana engaged in an open-ended pattern of racketeering activity involving multiple acts of mail fraud, wire fraud and other unlawful means, with the purpose and goal of fraudulently inducing the maximum number of persons to subscribe to Humana Health Plans for the benefit of Humana;

e.    Whether Humana purposely induced RICO Class Members to pay for health policies that were worth less than the value of the policies described by Humana by sending though the mails a series of documents containing material omissions and misrepresentations with respect to eligibility for payment of claims;

f.    Whether Humana is liable to RICO Class Members for treble damages for conduct actionable under the civil provisions of the RICO statute.

32.    Questions of law and fact common to the ERISA Class include, but are not limited

30

to:

a. Whether Humana's failure to operate Benefit Plans in accordance with the representations contained in the Disclosure Documents violated § 404 of ERISA,

b. Whether Humana, by its use of Undisclosed Cost-Based Criteria, provided direct financial incentives to claims reviewers and engaged in the other practices described above in violation of its duty to inform ERISA Class Members of any reduction in coverage as provided by § 104(b) of ERISA and its duty to discharge its responsibilities in accordance with Plan Documents § 404 (a) (1) (D);

c. Whether Humana's misrepresentations respecting the Medical Necessity Definition and its failure to disclose the use of Undisclosed Cost-Based Criteria, direct financial incentives to claims reviewers, direct financial incentives to physicians, and other practices described above and detailed below, violated its fiduciary duty to ERISA Class Members;

d. Whether Humana violated its fiduciary duty under ERISA by failing to disclose the incentives it created that might affect the physician-patient relationship and failing to provide promised coverage-benefits and failing to administer ERISA benefit plans in accordance with plan documents.

e. Whether Humana is liable to ERISA Class Members for restitutionary, injunctive and other relief pursuant to §§ 104 and 404 of the ERISA statute.

33. The above-identified common questions predominate over questions, if any, that may affect only individual Class Members.

34. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

Defendant.

35.    Defendant has acted on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes.

36.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the necessary duplication of evidence, effort, and expense that numerous individual actions would require.

## VII. FACTUAL BACKGROUND COMMON TO ALL CLAIMS

A.    Humana's National Health Care Network

37.    At all relevant times, there has existed a national health care network, assembled by Defendant Humana and consisting of Humana, the Humana Health Plans, and health care providers throughout the country, including primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies, all associated through contracts as part of the health care network for the common purposes of providing medical services to Humana customers and earning profits from the provision of those services. (This national network is hereinafter referred to as the "National Enterprise").

(a)    The National Enterprise is composed of:

(i)    Humana and subsidiaries set forth in paragraph 21 above;

(ii)    the primary doctors in private practice, who are not employees of Humana

12

or its subsidiaries, but who contract with Humana or its subsidiaries to provide primary care to Class Members through Humana's Health Plans;

(iii)   medical specialists who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide care to Class Members;

(iv)   medical laboratories that are not owned by Humana or its subsidiaries but that contract with Humana or its subsidiaries to provide diagnosis and other laboratory services for Humana and to Class Members;

(v)   hospitals that are not owned by Humana or its subsidiaries but that contract with Humana to provide hospital facilities and services for Humana and to Class Members;

(vi)   outpatient centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide outpatient services for Humana and to Class Members;

(vii)   pharmacies that are not owned by Humana or its subsidiaries but that contract with Humana to provide pharmaceutical services for Humana and to Class Members; and

(viii)   home health centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide home health services for Humana and to Class Members.

38.   The National Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky. The National Enterprise includes the following structural and operational

33

features:

- (a) "Nationally, Humana has assembled one of health care's largest networks."
  (Humana Web Site).

- (b) "Centralized management services are provided to each health plan from
  the Company's headquarters and service centers. These services include
  management information systems, product administration, financing,
  personnel, development, accounting, legal advice, public relations,
  marketing, insurance, purchasing, risk management, actuarial, underwriting
  and claims processing." (Humana 1998 10-K at 14).

- (c) "Humana operates one of the largest managed care data centers in the
  nation. The primary computing facility is located in Louisville, Kentucky.
  Humana's application systems are largely developed and maintained in-
  house by a staff of 400 application programmers who are versed in the use
  of state-of-the-art technology. . . . The information systems support
  marketing, sales, underwriting, contract administration, billing, financial,
  and other administrative functions as well as customer service,
  authorization and referral management, concurrent review, physician
  capitation and claims administration, provider management, quality
  management and utilization review." (Humana Web Site.)

- (d) "Humana's Information Systems organization operates in a centralized
  manner. Humana's data center and the majority of its programming and
  support staff are located at its corporate offices in Louisville, Kentucky."

34

(Humana Web Site.)

(e)  "The Company [Defendant Humana] is a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.1 million medical members.  The Company's products are marketed primarily through health maintenance organizations ("HMOs") and preferred provider organizations ("PPO's") that encourage or require the use of contracted providers."  (Humana 1999 10-Q (First Quarter), at 11-12).

(f)  The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

(g)  The Corporate Medical Affairs Department in Louisville forwards several reports to the local markets on a monthly basis to enable them to track the performance of individual physicians.

(h)  Pre-admission review is a centralized operation based in Louisville, including pre-admission certification for PPO's and pre-admission notification for HMO's.

39.  The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

B.  The State and Local Health Care Networks

40.  At all relevant times, in each state where Humana Health Plans operate, there have existed one or more state and/or local health care networks, assembled by Humana and consisting

35

of Humana, the state and/or local Humana Health Plan(s), primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies. (These state and local health networks are hereinafter referred to as the "State and Local Enterprises".)

(a)    Each of the Humana State and Local Enterprises is composed of:

(i)    Humana and one or more of the Humana subsidiaries set forth in paragraph 21 above;

(ii)    the primary doctors in private practice, who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide primary care to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(iii)    medical specialists who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide care to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(iv)    medical laboratories that are not owned by Humana or its subsidiaries but that contract with Humana or its subsidiaries to provide diagnostic and other laboratory services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(v)    hospitals that are not owned by Humana or its subsidiaries but that contract with Humana to provide hospital facilities and services for Humana and to Class Members through the Humana Health Plan or Plans that are

36

administered through the State or Local Enterprise;

(vi)    outpatient centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide outpatient services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise;

(vii)   pharmacies that are not owned by Humana or its subsidiaries but that contract with Humana to provide pharmacy services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise; and

(viii)  home health centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide home health services for Humana and to Class Members through the Humana Health Plan or Plans that are administered through the State or Local Enterprise.

41.    Each State and Local Enterprise is an association-in-fact operating for the common purposes of (1) providing medical services to Humana customers and (2) earning profits from the providing of those services. Each State and Local Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky. The features of the structure and operation of the State and Local Enterprises include the following:

(a)    "Nationally, Humana has assembled one of health care's largest networks. Locally, where care is delivered, our networks are as deep as they are broad, with primary doctors, specialists, lab services, hospitals, outpatient centers, pharmacies and home health agencies." (Humana Web Site).

(b)     "Centralized management services are provided to each health plan from
the Company's headquarters and service centers. These services include
management information systems, product administration, financing,
personnel, development, accounting, legal advice, public relations,
marketing, insurance, purchasing, risk management, actuarial, underwriting
and claims processing." (Humana 1998 10-K at 14).

(c)     "Humana operates one of the largest managed care data centers in the
nation. The primary computing facility is located in Louisville, Kentucky.
Humana's application systems are largely developed and maintained in-
house by a staff of 400 application programmers who are versed in the use
of state-of-the-art technology... The information systems support
marketing, sales, underwriting, contract administration, billing, financial,
and other administrative functions as well as customer service,
authorization and referral management, concurrent review, physician
capitation and claims administration, provider management, quality
management and utilization review." (Humana Web Site.)

(d)     "Humana's Information Systems organization operates in a centralized
manner. Humana's data center and the majority of its programming and
support staff are located at its corporate offices in Louisville, Kentucky."
(Humana Web Site.)

(e)     "The Company [Defendant Humana] is a health services company that
facilitates the delivery of health care services through networks of

38

providers to its approximately 6.1 million medical Members    The
Company's products are marketed primarily through health maintenance
organizations ("HMOs") and preferred provider organizations ("PPO's")
that encourage or require the use of contracted providers."  (Humana 1999
10-Q (First Quarter), at 11-12).

(f)    The administration of Humana's utilization management program is shared
among a centralized staff located in Louisville and staff located in each
market

(g)    The Corporate Medical Affairs Department in Louisville forwards several
reports to the local markets on a monthly basis to enable them to track the
performance of individual physicians.

(h)    "The Company's subsidiaries operate in states which require certain levels
of equity and regulate the payment of dividends to the parent company."
(Humana 1999 10-Q (First Quarter) at 15.)

(i)    Pre-admission review is a centralized operation based in Louisville,
including pre-admission certification for PPO's and pre-admission
notification for HMO's.

d.    Categories of Health Plans Offered by
Humana to Classes Members

42.    Humana operates the following types of HMOs: (a) a classic staff model, in which
the health plan corporation employs physicians and other health care professionals on a salaried or
capitated basis; (b) a staff-network model, in which staff physicians are supplemented by

39

physicians who contract with the health plan to be in its network of participating physicians and are paid negotiated fees; and (c) a mixed model. Under the "capitation" system, each physician or group of physicians receives a fixed monthly payment per Humana patient regardless of the amount of medical care that is provided to the patient or the patient requires. That is, under capitation, physicians do not receive a fee for each service actually rendered. Instead, monthly payments to physicians remain constant and must be used by the physicians to cover the cost of the physician time and all medical costs associated with the care provided by the physician — sometimes including hospitalization, specialists and diagnostic testing.

43.    Humana's Individual HMO Plan is a medically underwritten plan that provides broad coverage for individuals who are under age 65 and not eligible for Medicare and are not covered by a commercial group plan.

44.    All Humana HMOs provide a broad range of health services to covered patients. In order to obtain covered medical services, Humana customers must choose a primary care physician from the Plan's provider directory. The primary care physician provides, or arranges for other doctors to provide, all health care services for the member.

45.    Humana PPO plans are networks of providers that contract with Humana to provide services to Humana customers. Humana contracts with large networks of PPO physicians, hospitals and other health care professionals from whom Humana customers may seek services. Each PPO plan offers two levels of coverage, including one for services from non-participating providers. While network physicians are most commonly paid negotiated fees, increasingly such network physicians have "capitation" arrangements with Humana.

46.    Humana is also in the business of underwriting, administering and operating

40

employee welfare plans defined in 29 U.S.C. § 1002(1) as "any plan, fund, or programs which was heretofore or is hereafter established or maintained by an employer or by an employee organizations, . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits..."

47. A person can join a Humana Health Plan by submitting an application and enrollment form to the plan. Plan membership dues are paid on a periodic basis, and plan members have the option to renew their membership on an annual basis.

48. At all relevant times, Class Members purchased Health Policies directly or indirectly from Humana, by means of (a) cash payments, (b) salary deductions and/or (c) labor provided as quid pro quo for the purchase of health care coverage.

D.    Disclosures by Humana to Class Members

49. From time to time, Humana provided Class Members with descriptions or certifications of the benefits provided by their Humana Health Policies. During the RICO Class Period and the ERISA Class Period, Humana has on multiple occasions delivered or caused to be delivered to Class Members Disclosure Documents including: (i) summary plan descriptions; (ii) certificates of coverage; and (iii) other coverage descriptions that Humana mailed, or caused to be mailed, to each Class Member after each Class Member became a participant in a Humana Health Plan, (iv) notifications of modifications and changes to the plan, and (v) penta-annual updated summary plan descriptions that Humana mailed or caused to be mailed to Class Members and that integrated all plan amendments made within such five-year period.

50. The Health Policies Humana sold to Class Members during the RICO Class Period and ERISA Class Period were standard in all respects relevant to Plaintiffs' claims and the claims

41

of the Classes; all contained the Humana Medical Necessity Definition set forth in paragraph 23 above. According to the Disclosure Documents, Humana Health Plans insure specified health services where Humana determines that they satisfy the Medical Necessity Definition set forth in paragraph 23.

E.      Humana's Fraudulent
        Omissions to the Classes

51.    Humana has fraudulently concealed from Class Members numerous practices that have the purpose and effect of reducing the value of the Health Plans for which Class Members paid. For example:

(a)    The Disclosure Documents failed to disclose that Humana provides direct cash bonuses and other financial incentives to claims reviewers who deny claims for service or limit hospital admissions and stays regardless whether those claims or hospital admissions otherwise satisfied the Medical Necessity Definition. The bonuses and financial incentives provided by Humana included, among other things, a "Utilization Incentive Plan" that provided for direct bonus payments and other benefits to claim reviewers who denied a certain percentage or absolute number of submitted claims for hospital costs from Class Members, irrespective whether the submitted claims satisfied the Medical Necessity Definition. These incentives thus reduced the value of the Health Plans for which Class Members paid.

(b)    The Disclosure Documents failed to disclose that in addition to, or in place of, the

42

Medical Necessity Definition, Humana uses Undisclosed Cost-Based Criteria to approve or deny benefit claims by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base coverage determinations on considerations other than medical necessity and contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medically necessary services available to Class Members and did reduce the value of the Health Plans for which Class Members paid.

(c)    The Disclosure Documents failed to disclose that Humana subcontracts to third parties, such as Value Health Science (VHS), responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures. In determining payment eligibility for claims submitted by Class Members, these third parties use criteria different from and more restrictive than, the Humana Medical Necessity Definition.

(d)    The Disclosure Documents failed to disclose that in determining payment eligibility for claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition

43

furnished to Class Members in the Disclosure Documents.

(e)     The Disclosure Documents failed to disclose that Humana creates direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, even where the treatment for which coverage is proposed satisfies the Humana Medical Necessity Definition. Among other things, Humana failed to disclose that

(i)     it enters into risk-sharing arrangements with physicians, including without limitation so-called "capitated payment" arrangements, that provide financial incentives to treating physicians for not prescribing or recommending treatment for Class Members.

(ii)     In addition, Humana failed to disclose that it contracts to use VHS's Practice Review System to analyze the clinical practice patterns of individual physicians, physician networks and health care plans in order to identify both "cost effective" physicians and physicians who utilize more than the optimal amount of health services. Network physicians are notified by Humana of undesirable practice profiles (that is, health service utilization rates) and are reminded that Humana contracts only with practitioners who provide "appropriate utilization". These notifications pressure network physicians to restrict care and prescribe medical services that satisfy criteria other than those contained in the Humana Medical Necessity Definition.

(iii)     Also, Humana engages in undisclosed automatic "downcoding" of claims

44

submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians. Arbitrary or automatic downcoding creates a disincentive for physicians to perform certain medical procedures, even when medically necessary, because they are not likely to be paid for them.

Taken together, these various undisclosed arrangements and incentives are designed to influence the extent of coverage available to Class Members in a manner that is inconsistent with the Medical Necessity Definition, because such incentives were designed to make it more likely than otherwise that doctors would deny care or a level of care otherwise satisfying the criteria included in the Medical Necessity Definition.

(f)     The purpose and effect of the fraudulent, material omissions identified in this paragraph was to reduce the value of the Health Plans for which Class Members paid below the value of the Health Plans as described in the Disclosure Documents, and thereby to benefit Humana.

(g)     Humana knowingly and intentionally failed to disclose to Class Members all the material omissions identified in this paragraph, with the intent to hide their use and influence from Class Members.

**J.     Humana's Material Misrepresentations
to the Classes**

52.     Having made the omissions identified in the preceding paragraph, Humana also

45

misrepresented to the Classes in the Disclosure Documents that treatment and coverage decisions under Humana Health Plans would be based on the Medical Necessity Definition. This representation was an affirmative misrepresentation because Humana knew that Humana (and entities to whom Humana delegated responsibility for administering its Health Plans) made treatment and coverage decisions on the basis of cost-based criteria and financial incentives unrelated to, and more restrictive than, the Medical Necessity Definition, with the effect of reducing the value of the Health Plans for which Class Members paid. For example:

(a)    Humana knowingly uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition, to approve or deny benefit claims by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base coverage determinations on considerations other than medical necessity and contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medically necessary services available to Class Members and did reduce the value of the Health Plans for which Class Members paid.

(b)    Humana provides direct cash bonuses and other financial incentives to claims reviewers who deny claims for service or limit hospital admissions and stays regardless whether those claims or hospital admissions otherwise satisfied the

46

Medical Necessity Definition. The bonuses and financial incentives provided by Humana included, among other things, a "Utilization Incentive Plan" that provided for direct bonus payments and other benefits to claim reviewers who denied a certain percentage or absolute number of submitted claims for hospital costs from Class Members, irrespective whether the submitted claims satisfied the Medical Necessity Definition. These incentives thus reduced the value of the Health Plans for which Class Members paid.

(c)    Humana subcontracts to third parties, such as Value Health Science (VHS), responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures. In determining payment eligibility for claims submitted by Class Members, these third parties use criteria different from and more restrictive than, the Humana Medical Necessity Definition.

(d)    In determining payment eligibility for claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Disclosure Documents.

(e)    Humana creates direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, even where the treatment for which coverage is proposed satisfies the Humana Medical Necessity Definition. Among other things, Humana failed to

47

disclose that

(i)     it enters into risk-sharing arrangements with physicians, including without

        limitation so-called "capitated payment" arrangements, that provide

        financial incentives to treating physicians for not prescribing or

        recommending treatment for Class Members.

(ii)    In addition, Humana failed to disclose that it contracts to use VHS's

        Practice Review System to analyze the clinical practice patterns of

        individual physicians, physician networks and health care plans in order to

        identify both "cost effective" physicians and physicians who utilize more

        than the optimal amount of health services. Network physicians are

        notified by Humana of undesirable practice profiles (that is, health service

        utilization rates) and are reminded that Humana contracts only with

        practitioners who provide "appropriate utilization". These notifications

        pressure network physicians to restrict care and prescribe medical services

        that satisfy criteria other than those contained in the Humana Medical

        Necessity Definition.

(iii)   Also, Humana engages in undisclosed automatic "downcoding" of claims

        submitted by physicians, a process whereby (among other things) Humana

        arbitrarily changes the benefits code assigned to rendered services so as to

        reduce the payments due physicians. Arbitrary or automatic downcoding

        creates a disincentive for physicians to perform certain medical procedures,

        even when medically necessary, because they are not likely to be paid for

48

them.

Taken together, these various undisclosed arrangements and incentives are designed to influence the extent of coverage available to Class Members in a manner that is inconsistent with the Medical Necessity Definition, because such incentives were designed to make it more likely than otherwise that doctors would deny care or a level of care otherwise satisfying the criteria included in the Medical Necessity Definition.

(f)     The purpose and effect of the fraudulent representations identified in this paragraph was to reduce the value of the Health Plans for which Class Members paid below the value of the Health Plans as described in the Disclosure Documents, and thereby to benefit Humana.

(g)     Humana knowingly and intentionally engaged in the misrepresentations identified in this paragraph, with the intent of misleading Class Members.

**G.  Humana Takes Actions that are Inconsistent
     with the Interests of the Classes**

53.     Managed health care need not be provided in a manner that creates conflicts of interests between a managed care provider on the one hand and the plan participants on the other hand.  In violation of its duties under ERISA and other legal and fiduciary obligations, however, Humana took purposeful actions that created conflicts between Humana as ERISA fiduciary and ERISA Class Members as ERISA beneficiaries.  Among other things:

(a)     Humana directly and/or indirectly employed doctors, nurses and other persons to review benefit claims submitted by Class Members and *gave express financial incentives to such claim reviewers to deny such claims or limit hospital stays*

*regardless whether hospital stays otherwise satisfied the Humana Medical*

*Necessity Definition included in the Disclosure Documents distributed to Class*

*Members.* These financial incentives included, among other things, a Utilization

Incentive Plan that provided for direct bonus/payments and other benefits to claims

reviewers who denied a certain percentage or absolute number of submitted

hospital claims from Class Members.

(b)    Humana retained outside management consultants, including without limitation

Coopers & Lybrand, to make recommendations that Humana then implemented,

relating to the management of Health Benefit Plans, including without limitation

procedures used by Humana to determine payment eligibility for claims submitted

by the Class, to review denied claims, and to determine the scope of covered

benefits. In engaging these management consultants, Humana principally sought to

achieve financial benefits for Humana and its shareholders by, among other things,

lowering the rates of utilization of services by Class Members without regard to

medical necessity, thereby reducing the value of the Health Plans to Class

Members. Thus, in violation of ERISA and other legal and fiduciary obligations,

Humana adopted the recommendations of outside managers and consultants to

promote the interests of shareholders and Humana executives at the expense of

Class Members.

(c)    Humana engaged in automatic "downcoding" of claims submitted by physicians, a

process whereby (among other things) Humana arbitrarily changes the benefits

code assigned to rendered services so as to reduce the payments due physicians.

"Downcoding" creates a negative incentive for physicians with respect to performing or recommending certain medical procedures, even when medically necessary, because they are not likely to be paid for them and therefore reduces the value of the health insurance benefits recieved by Class Members.

(d)     Humana based coverage decisions on guidelines developed by third parties that Humana intended to reduce the level of coverage available to Class Members. By way of example only, Humana, for the express purpose of reducing patient care utilization rates without regard to medical necessity, used guidelines purchased from Milliman & Robertson. The Milliman & Robertson guidelines employ criteria that are different from and more restrictive than the Medical Necessity Definition set forth in Disclosure Documents.

(e)     In connection with the management of Health Benefit Plans and the process for determining payment eligibility for claims submitted by the Class, Humana contracted with third parties, including by way of example only, Value Health Science, for the purpose of developing and using medical administration software to screen claims submitted by Class Members. Humana contracted with Value Health Science for the purpose of reducing coverage and patient care utilization rates, in order to benefit Humana, and not for the primary purpose of protecting or promoting the interests of the participants and beneficiaries. By using the services of Value Health Science, Humana created a conflict between the interests of Humana in making a profit and the interests of Class Members in obtaining coverage as represented.

51

(f)    Humana directly and/or indirectly employed doctors as "hospitalists" to make

treatment as well as coverage decisions for Class Members when they were

admitted for inpatient hospital services. Humana created express financial

incentives to those doctors to shorten hospital stays, including specified dollar

payments for each day earlier than the norm that a patient was discharged or the

level of whose inpatient care was downgraded. *These incentives were provided*

*irrespective whether the discharge or downgrade was consistent with the patient's*

*medical necessity.*

H.    Humana Operates its Network to Implement
      and Promote its Wrongful Scheme

54.    Humana purposefully created a centralized structure – the National Enterprise –

to carry out its fraudulent scheme of misleading statements and material omissions in disclosures

to Class Members. Through the National Enterprise, Humana knowingly and intentionally.

(a)    maintained centralized control over the content of the summary plan

descriptions, certificates of coverage, other Disclosure Documents, plan

descriptions, notifications of modifications and changes to plans, that were

distributed to Class Members;

(b)    maintained centralized control over, and deceived Class Members with

respect to, the existence and use of Undisclosed Cost-Based Criteria;

(c)    maintained control, implemented, and deceived Class Members with

respect to claims reviewer bonuses, including without limitation, the

Utilization Incentive Plan that provided for direct bonus payments and

other benefits to claim reviewers who denied a certain percentage or absolute number of submitted claims from Class Members;

(d)    maintained centralized control over, arranged for, and deceived Class Members with respect to subcontracts to third parties, such as Value Health Science, for the review of claims and the management of providing benefits for certain medical conditions and medical procedures;

(e)    maintained centralized control over, and deceived Class Members with respect to direct financial incentives to treating physicians and other health care professionals designed to encourage denial of coverage to individuals enrolled in Humana's Benefit Plans, irrespective whether the treatment for which coverage was sought would satisfy the Medical Necessity Definition disclosed by Humana.

55.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to Class Members about operations of the State and Local Enterprises.  By making these material omissions and misrepresentations, Humana was able to operate the National Enterprise with sufficient participants to preserve the State and Local Enterprises, whose ability to pay dividends to the parent company, Humana, often required state or local regulatory approval.

(a)    Humana maintained centralized control over the content of the Disclosure Documents distributed to Class Members, and Humana knowingly and purposefully conducted the affairs of the State and Local Enterprises through the material omissions and misrepresentation in these documents.

53

(b)    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Class Members of the Undisclosed Cost-Based Criteria used to determine whether to approve or deny benefit claims by Class Members, including without limitation the Interqual Criteria, the Milliman & Robertson guidelines, and guidelines and criteria developed and/or used by Value Health Science.

(c)    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, the cash bonuses and other financial incentives provided to doctors, nurses and other persons involved in the process of approving or denying benefit claims by Class Members. Through centralized planning and implementation, Humana developed and implemented the system of bonuses and other financial incentives, including without limitation the Utilization Incentive Plan that provided for direct bonus payments and other benefits to claim reviewers who denied a certain number of requests for coverage of medical services for Class Members.

(d)    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, subcontracts to third parties, such as Value Health Science, for the review of claims and the management of providing benefits for certain medical conditions and medical procedures.

(e)    Humana also conducted the affairs of the State and Local Enterprises by

54

         —    maintaining control over, and precluding disclosure to Class Members of, direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, regardless whether the treatment would satisfy the Humana Medical Necessity Definition disclosed by Humana.

I.    <u>Harm to the Classes</u>

      56.    By means of this wrongful conduct, Humana intended to and did provide to Class Members coverage of lesser value than the coverage represented to Class Members. Humana intended to retain, and did retain, the difference between the value of the coverage described in the Disclosure Documents and the value of the coverage actually provided to Class Members. Humana's wrongful conduct directly and proximately injured each Class Member in an amount, to be determined at trial, equal to the difference in value between the coverage described in the Disclosure Documents and the coverage actually provided to Class Member.

      57.    Under the terms of their Humana Health Plans, Class Members were entitled to receive coverage for services consistent with the Humana Medical Necessity Definition. This coverage was of value to Class Members and was purchased by them, directly or indirectly, with their cash, salaries, and personal services. Class Members paid for and were entitled to the coverage whether or not they ever submitted claims for medical losses.

      58.    As a result of the application of Undisclosed Cost-Based Criteria to claims for services submitted by Class Members, and the other conduct and practices described above, the coverage actually provided to all Class Members under their Plans was, in fact, coverage that was different from the coverage that was to be provided under the Humana Medical Necessity

Definition set forth in Disclosure Documents distributed to Members of the Class. Through the application of the Undisclosed Cost-Based Criteria, Undisclosed Cash Incentives and the other conduct and practices described above, Humana denied all Class Members the coverage they had purchased and that was due to them under the terms of their Benefit Plans.

59      The value of the coverage purchased by all Class Members, defined by the Humana Medical Necessity Definition and due under the terms of their Humana Health Plans, was greater than the value of the coverage actually provided by Defendant Humana. Each Class Member was thus denied and deprived of the value of the coverage defined in the Health Policies and was thereby damaged in an amount to be determined at trial, equal to the difference between the value of the coverage purchased and the value of the coverage actually provided.

## VIII. COUNT ONE

### Violation of RICO, 18 U.S.C. § 1961 et seq.
(Applicable to RICO Class Members)

60.     Plaintiffs, on behalf of themselves and the RICO Class, incorporate by reference all preceding paragraphs as if fully set forth herein.

A.      Overview of RICO Claim

61.     For the reasons stated in the preceding paragraphs and for the reasons set forth below, Defendant Humana engaged in unlawful conduct in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and in particular 18 U.S.C. § 1962(c). Defendant Humana is the sole wrongdoer alleged herein to have violated RICO.

62.     Defendant Humana is liable under 18 U.S.C. § 1962(c) for conducting the affairs

of an enterprise through a pattern of racketeering activity.

(a)    Specifically, and as described in more detail above, Humana participated in the operation and management of both a national health care network, and state and local health care networks, consisting of Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.  The participants in each of the national, state and local health care networks were associated in fact for the common purposes of providing medical services to Humana customers and earning profits from providing those services and each network thus was an enterprise with the meaning of RICO.

(b)    As also described in more detail above, Humana engaged in an open-ended pattern of racketeering activity involving multiple acts of mail fraud, with the purpose and goal of fraudulently inducing the maximum number of persons to subscribe to Humana Health Plans for the benefit of Humana.

63.    Plaintiffs and RICO Class Members were the victims of Humana's wrongful conduct.  As set forth above, RICO Class Members were induced by a series of fraudulent statements and omissions to subscribe to health care policies offered by Humana, that were worth less than the value of the policies described by Humana in the fraudulent statements.

64.    By means of this wrongful conduct, Humana intended to and did provide to the RICO Class Members coverage of lesser value than the coverage represented to RICO Class Members.  Humana intended to retain, and did retain, the difference in value between the coverage described in the Summary Plans and other Disclosure Documents and the coverage

57

actually provided to RICO Class Members  Humana's wrongful conduct directly and proximately injured each member of the RICO Class in an amount, to be determined at trial, equal to the difference in value between the coverage described in the Summary Plans and other Disclosure Documents and the coverage actually provided to RICO Class Members.

B.    Pattern of Racketeering Activity

65.    Defendant Humana has engaged in an open-ended pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), involving multiple predicate acts of mail fraud (18 U.S.C. §§ 1341 and 1342), with the purpose and goal of fraudulently inducing persons to join Humana Plans, thereby permitting Humana to enrich itself unjustly by providing coverage of lesser value than that offered to induce persons to join the Plans.

(a)    Since August 1995, Humana has repeatedly delivered or caused to be delivered to RICO Class Members, by means of the United States Postal Service, documents containing material misrepresentations and omissions concerning its determination of coverage of claims submitted by Class Members and the amount, quality and circumstances of covered care and services actually offered by Humana Health Plans.

(b)    As alleged above, these documents include (i) the summary plan descriptions, (ii) the certificates of coverage, and (iii) other plan descriptions that Humana mailed, or caused to be mailed, to each member of the RICO Class after each RICO Class member became a participant in a Humana Health Plan.  The documents also include (iv) the notifications that Humana mailed or caused to be mailed to RICO Class Members setting forth modifications and changes to the plan, as well as (v)

58

the penta-annual updated summary plan descriptions that Humana mailed or caused to be mailed to RICO Class Members and that integrated all plan amendments made within such five-year period.

(c)   As set forth in detail in paragraph 52 above, the above-referenced Disclosure Documents contained material misrepresentations.

(i)    Specifically, the Disclosure Documents represent that coverage determinations under Humana Health Plans will be made in accord with the Humana Medical Necessity Definition. The Disclosure Documents failed to disclose that Humana and those to whom Humana delegated responsibility for administering its Health Plans made treatment and coverage decisions on the basis of cost-based criteria unrelated to, and more restrictive than, the Medical Necessity Definition.

(ii)    For example, and without limitation, the Medical Necessity Definition was a willful misrepresentation in that Humana knowingly uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition,  to approve or deny claims for medical services by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria  vary in detail, they share one critical dimension: in whole or in part, they all base treatment and coverage determinations on non-medical considerations, contrary to the terms of the

59

Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medical services available to RICO Class Members and did reduce the value of the Health Plans for which RICO Class Members paid.

(iii)    Humana's representation in various Disclosure Documents that coverage determinations would be based on the Medical Necessity Definition was therefore false, inaccurate and misleading. Humana used additional, more restrictive undisclosed criteria to make coverage decisions, with the purpose of refusing to cover medically necessary services and the effect of reducing the value of the health coverage provided to RICO Class Members.

(d)    Also as set forth in detail above, Humana knowingly and intentionally concealed material information from RICO Class Members including, among other things, that:

(i)    Humana provides cash bonuses and other financial incentives to doctors, nurses and other persons involved in the process of approving or denying claims for medical services by RICO Class Members, and those bonuses and other incentives are designed to cause a decrease or stabilization in utilization rates regardless whether those services would otherwise satisfy the Humana Medical Necessity Definition disclosed in the Humana Summary Plans and other Disclosure Documents furnished to RICO Class Members.

60

(ii)    Humana uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition, to approve or deny benefit claims by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base treatment and coverage determinations on non-medical considerations, contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medical services available to RICO Class Members and did reduce the value of the Health Plans for which RICO Class Members paid.

(iii)   Humana subcontracts to third parties, such as Value Health Science, the review of claims, and the management of the utilization of medical services for certain medical conditions.

(iv)    In determining payment eligibility for claims submitted by RICO Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the medical training and specialization to determine whether particular medical services should be covered in accordance with the Humana Medical Necessity Definition furnished to RICO Class Members in the Disclosure Documents.

61

(v)     Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, regardless whether the medical services satisfy the Humana Medical Necessity Definition disclosed in Humana's Summary Plans and other Disclosure Documents.

66.     Defendant maintained a continuing pattern of racketeering activities within the meaning of 18 U.S.C. §1961(5), described above, consisting of knowingly misrepresenting and selling coverage for medical services under Health Policies provided to RICO Class Members; fraudulently failing to disclose material information, and secretly administering such Health Plans with intent to defraud Plaintiff RICO Class Members, all in violation of 18 U.S.C. §§ 1341 - 43, over a number of years during the RICO Class Period.  These activities amounted to a common course of conduct to deceive RICO Class Members, by means of uniform written misrepresentations and omissions, respecting the type and extent of their coverage under their Humana Health Plans.   Humana's wrongful acts all had the same pattern and similar purpose of defrauding RICO Class Members for the benefit of Humana.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the RICO Class.  Such activities are part of Defendant's ongoing way of doing business and constitute a continuing threat to the property of the RICO Class.

C.     The Enterprise

(1) The National Enterprise

67.     As described in detail in paragraphs above, at all relevant times, there existed a

62

national health care network, assembled by defendant Humana and consisting of Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies, all associated in fact as part of the health care network with common purposes of providing medical services to Humana customers and earning profits from the providing of those services.

68.    The National Enterprise is an association-in-fact operating for the common purposes of: (1) providing health insurance coverage and medical services to Humana customers, and (2) earning profits from the providing of those services.  The National Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky.  The features of the structure and operation of the National Enterprise are described in detail at paragraphs 37-39 above.

69.    In violation of 18 U.S.C. §1962(c), Defendant, during the RICO Class Period, conducted and participated in the conduct of the affairs of the National Enterprise through the ongoing pattern of racketeering activity described in paragraphs 37-39 above.  Defendant promoted, sold and implemented the Humana Health Policies through mail fraud as described above, with the purpose of maximizing the profits to be earned from premium and other payments made by RICO Class Members, directly or indirectly, to Humana.

70.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to RICO Class Members through the operations of the National Enterprise.  By making these material omissions and misrepresentations, Humana induced increased participation in the National Enterprise and enhanced the financial position of the National Enterprise.  See paragraphs 37-39 above.

(2)  The State and Local Enterprises

71.     As detailed in paragraphs 40-41 above, at all relevant times, in each state where Humana Health Plans operate, there existed one or more state and/or local health care networks, assembled by Humana, and consisting of Humana, the state and/or local Humana Health Plan(s), primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.

72.     Each State and Local Enterprise is an association-in-fact operating for the common purposes of (1) providing health insurance coverage and medical services to Humana customers; and (2) earning profits from the providing of those services.  Each State and Local Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky.  The features of the structure and operation of the State and Local Enterprises are described in detail above at paragraphs 40-41.

73.     In violation of 18 U.S.C. § 1962(c), Defendant, during the RICO Class Period, conducted and participated in the conduct of the affairs of the State and Local Enterprises through the ongoing pattern of racketeering activity described in paragraphs 40-41 above.  Defendant promoted, sold and implemented the Humana Health Policies through mail fraud as described above, with the purpose of maximizing the profits to be earned from premium and other payments made by RICO Class Members, directly or indirectly, to Humana.

74.     Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to RICO Class Members of the operations of the State and Local Enterprises.  By making these material omissions and misrepresentations, Humana induced increased participation in the National Enterprise with

sufficient participants and thereby enhanced to financial position of the State and Local Enterprises, whose ability to pay dividends to the parent company, Humana, often required state or local regulatory approval.

75. As set forth above, Defendant Humana is one of the entities participating in the association-in-fact that constitutes the National Enterprise and the State and Local Enterprises, but Defendant Humana is different from the National Enterprise and the State and Local Enterprises. As set forth above, Defendant Humana is the perpetrator of the pattern of racketeering activity through which it conducted and participated in the conduct of the affairs of the National Enterprise and of the State and Local Enterprises.

D. **Relationship between the Pattern of Racketeering Activity and the Enterprise**

76. The pattern of racketeering activity alleged herein and the enterprise alleged herein are separate from each other. Humana engaged in the pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the alleged enterprise, a national health care network, and state and local health care networks, consisting of Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.

77. The participants in each of the national, state and local health care networks were associated in fact for the common purposes of providing health insurance coverage and medical services to Humana customers and earning profits from the providing of those services.

E. **Reliance of the Class**

78. As Humana knew they would, RICO Class Members reasonably relied on the

accuracy, completeness and integrity of Humana's disclosures, with the result that they purchased health policies and continue to enroll in Humana Health Plans. Had Plaintiffs and RICO Class Members known of existence of Undisclosed Cost-Based Criteria, Undisclosed Denial Incentives, use of third party contractors to perform claims review, incentives to physicians and others to deny claims, and the other practices and incentives designed to reduce the value of their coverage, they would have taken corrective measures, including but not limited to withdrawing from their Humana Health Plans or requesting that their employer provide Health Plan alternatives other than Humana.

79.     Humana's misrepresentations and omissions in various Disclosure Documents described above were a proximate cause of the injuries suffered by RICO Class Members. By reason of Humana's pattern of fraudulent conduct, RICO Class Members paid for the coverage consistent with the terms of the Disclosure Documents, but received less valuable coverage.

80.     As an insurer and party to an insurance transaction with RICO Class Members, Humana had a duty to disclose material information and to refrain from material misrepresentations. Class Members relied on this special relationship in accepting the completeness and accuracy of Humana's disclosures.

81.     Humana acted as a fiduciary in respect to those RICO Class Members who were also members of the ERISA Class. Humana therefore had a heightened duty to these RICO Class Members, who relied on the completeness of Humana's representations. In reliance on this fiduciary relationship, moreover, RICO Class Members who were also members of the ERISA Class relied to their detriment on the material misrepresentations contained in the Disclosure Documents.

66

F   Benefits of Racketeering Activity

82.   Defendant Humana benefited from its pattern of wrongful conduct by using the proceeds of that conduct to earn profits, to maintain control over the National Enterprise and the State and Local Enterprises, and to sustain the solvency of the National Enterprise, the State and Local Enterprises, and of Humana itself. Through its pattern of racketeering activity, Humana was able to cause RICO Class Members to pay, directly or indirectly, periodic fees for medical coverage. As a result of this wrongful conduct, Humana unjustly retained the difference between the value of the coverage promised to the RICO Class in Health Policies purchased by RICO Class Members and the value of the coverage actually provided to RICO Class Members, in an amount to be determined at trial.

G.   Effects on Interstate Commerce

83.   Each of the Plaintiffs and RICO Class Members, and the Defendant Humana, are "persons" within the meaning of 18 U.S.C. § 1963.

84.   Defendant Humana operates a national interstate health network, with 95% of Humana's membership in 15 states – Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming – and Puerto Rico.  Humana offers health plans and other employee benefit products in at least 38 states, including (in addition to the 15 states listed above) Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.  Since 1983, Humana, through a network of providers, has offered health care services to approximately 6.2 million persons annually.  Humana contracts with more than

67

9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

85.    The practices alleged herein involve the conduct of, and affect, interstate commerce, and involve assets and revenues in excess of hundreds of millions of dollars annually, in an amount to be determined at trial.    The pattern of racketeering activity alleged herein is within the flow of, and substantially affects, interstate commerce.

H.    Direct Injury and Damages

86.    Plaintiffs and RICO Class Members paid periodic fees that reflected the value of coverage represented, rather than the actual value of the coverage, directly or indirectly, to Defendant Humana.    As a direct and proximate result of the practices described above, Humana unjustly retained the difference between the value of the coverage promised to the RICO Class in Health Policies and purchased by RICO Class Members, and the value of the coverage actually provided to RICO Class Members.    These damages are of an amount to be determined at trial.

87.    As a direct and proximate result of Defendant's violations of 18 U.S.C. §1962(c), Plaintiffs and the RICO Class have been injured in their business or property. The business and property of the Plaintiff RICO Class was directly and proximately injured as a result of Defendant's racketeering activities, as described above, in that but for Defendant's fraudulent conduct, racketeering activities and knowing misrepresentation of the coverage actually provided by Health Policies, Plaintiff RICO Class Members would not have paid as much for their Health Policies as, in fact, they paid in cash, salary deductions and labor.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action on behalf of the RICO Class, and Plaintiffs and the RICO Class are entitled to recover herein actual and treble damages, the costs of bringing this

68

suit and attorneys' fees.

88.     Defendant's use or investment of racketeering income or the proceeds thereof to acquire interests in or to operate the aforementioned enterprises injured RICO Class Members in their business and property in that the Defendant operated the aforementioned enterprises for the purpose and with the effect of: (a) promoting, selling and implementing RICO Class Members' Health Policies under the false representation that the coverage of medically necessary treatment described in the Health Policies was the same as the coverage of medically necessary treatment actually provided through use of the Undisclosed Cost-Based Criteria, and (b) inducing Class Members to pay more than the fair value for the insurance coverage actually provided under their policies as administered by Defendant.

89.     The property of which RICO Class Members were deprived by Defendant's fraudulent and deceptive practices consists of the difference between the value paid, directly and indirectly, by Class Members in cash, salary deductions and labor for the Health Policy as represented by Defendant and the fair value of the coverage Plaintiffs actually were provided by under the Health Policies as administered by Defendant, in an amount to be determined at trial.

### IX COUNT TWO

#### Breach of Disclosure
#### Obligations Under ERISA
(Applicable to Members of the ERISA Class)

90.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

91.     ERISA requires that each participant covered by an employee benefit plan be furnished a summary plan description written in a manner calculated to be understood by the average plan participant, sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan and containing, among other things, information regarding: whether a health insurance issuer is responsible for the financing or administration of the plan; the plan's requirements respecting eligibility for participation and benefits; and circumstances which may result in disqualification, ineligibility or denial or loss of benefits. ERISA, §§ 102(a)(1) and (b), 104, 29 U.S.C. §§ 1021, 1022, 1024(b). In addition, section 104(b) as amended requires that a summary description of any reductions in covered services must be provided to participants and beneficiaries within 60 days after the changes are adopted.

92.     As an ERISA fiduciary administering, managing and controlling the Health Benefit Plans of the ERISA Class, acting under the authority vested in it by plan sponsors, Humana failed to satisfy the requirements of ERISA 29 U.S.C. §§ 1022-24 because Humana failed to disclose in Disclosure Documents, written and provided by Humana to ERISA participants and beneficiaries, the Benefit Plans' requirements respecting the rights of participants and beneficiaries under the Benefit Plans; eligibility for participation and benefits; the circumstances which may result in disqualification, ineligibility or denial or loss of benefits; and the source of financing of the Benefit Plans and the identity of any organization through which benefits are provided. Because Humana failed to make these disclosures, the Members of the ERISA Class could not know exactly where they stood with respect to the Benefit Plans.

93.     By way of example only, in violation of §§ 102 and 104 of ERISA, 29 U.S.C.

70

§§1022 and 1024, Humana, as detailed above, failed to disclose to ERISA Class Members that, among other things:

(a)   Humana applies Undisclosed Cost-Based Criteria, using factors different from and more restrictive than those described in the Humana Medical Necessity Definition, to determine whether to approve or deny claims submitted by ERISA Class Members;

(b)   Humana provides cash bonuses and other financial incentives to doctors, nurses and other persons involved in the process of approving or denying claims of Members of the ERISA Class, and those bonuses and other incentives are designed to cause a decrease or stabilization in utilization rates even for services that would otherwise satisfy the Humana Medical Necessity Definition disclosed in the Humana Summary Plans and other Disclosure Documents furnished to ERISA Class Members.

(c)   Humana subcontracts to third parties, such as Value Health Science, the review of claims and the management of the utilization of services for certain medical conditions.

(d)   In determining payment eligibility for claims submitted by ERISA Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and non-physicians who lacked the training and specialization necessary to determine whether coverage for services should be provided in accordance with the Humana Medical Necessity Definition furnished to ERISA Class Members in the Disclosure Documents.

71

  (e)  Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, regardless whether the medical services satisfy the Humana Medical Necessity Definition disclosed in Humana's Disclosure Documents.

  94  By failing to notify ERISA Class Members from time to time when coverage was reduced through the application of Undisclosed Cost-Based Criteria and other means, Defendant violated § 104(b) of ERISA requiring such notification within 60 days of the effective date of such reductions.

  95.  Under § 502 of ERISA, 29 U.S.C. § 1132(a)(3) (B), ERISA Class Members are entitled to appropriate equitable relief including restitutionary and injunctive relief to redress the violations set forth above of the reporting and disclosure requirements set forth § 104 of ERISA.

## X. COUNT THREE

### Breach of Fiduciary Duty Under ERISA
### (Applicable to Members of the ERISA Class)

  96.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

  97.  At all relevant times, Defendant Humana was a fiduciary under ERISA.

### A. The Duty of Loyalty- ERISA Section 104(a)(1)

  98.  By virtue of the conduct described above, Humana breached its fiduciary obligations under § 404 (a)(1) of ERISA, 29 U.S.C. §1104(a)(1), to discharge its duties with respect to the Humana Benefit Plan s "solely in the interest" of the participants and beneficiaries,

and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.

99.    Humana's duty of loyalty under ERISA includes the obligation to deal fairly and honestly with all Plan Members; to refrain from material misrepresentations in respect to the level of coverage; and to communicate material facts which risk to affect adversely a plan member's interests.

100.    While managed health care need not be provided in a manner that creates a conflict of interest between an ERISA fiduciary and beneficiaries, Humana took purposeful actions, described in detail above, that created a conflict of interest between Humana, as fiduciary, and ERISA Class Members as beneficiaries, thereby breaching its duty of loyalty.

101    Humana has also breached its duty of loyalty by failing to disclose to ERISA Class Members that Humana used Undisclosed Cost-Based Criteria and direct financial incentives to claims reviewers, by failing to disclose that Humana contracted with third parties to screen claims by ERISA Class Members, by failing to disclose that Humana provided incentives for physicians that are intended to reduce the amount or level of care provided, and by employing "hospitalists" to make treatment and coverage recommendations for inpatient services subject to express financial incentives to shorten hospital stays and that Humana engaged in the other practices described in paragraph 93.

102.    The incentives and practices described in the preceding paragraph are material information which ERISA requires Humana to disclose to ERISA Class Members.

103.    By failing to disclose this material information, Humana breached its fiduciary duty to ERISA Class Members.

73

B.  Duty to Discharge Responsibilities in Accordance with
    Plan Documents -- Section 404(a)(1)(D) of ERISA

    104.    By failing to use the Humana Medical Necessity Definition and appropriate criteria
to evaluate the medical necessity of ERISA Class Members' claims for medical services,
Defendants failed to carry out the terms of ERISA Class Members' Benefit Plans as implemented
through Humana Plans and Policies and the benefit descriptions provided to employees, and
thereby violated the duty to discharge responsibilities in accordance with plan documents pursuant
to ERISA § 404(a)(1)(D), 29 U.S.C.§ 1104(a)(1)(D).

C.  Duty to Discharge Duties With Care, Skill and Prudence. - Section 404(a)(1)(B)

    105.    By managing, operating and administering ERISA-governed Benefit Plans insured
by Humana Health Policies in the manner described above, including the failure to disclose the use
of Undisclosed Cost-Based Criteria and direct financial incentives to claims reviewers to influence
claims review decisions, Defendants failed to exercise the care of an ordinarily prudent person
engaged in a similar activity under prevailing circumstances, all in violation of ERISA
§ 404(a)(1)(B); 29 U.S.C.§1104 (a)(1)(B).

D.  Unjust Enrichment

    106.    Defendant breached its fiduciary duty by materially misleading Plaintiffs and the
ERISA Class to whom the duties of candor, loyalty and prudence were owed, reaped the benefits
of that deception by receiving unearned premium revenues from the Plaintiffs and the ERISA
Class and unjustly retained that enrichment.

    107.    By evaluating the medical necessity of medical services in accordance with the
Undisclosed Cost-Based Criteria, by creating and implementing direct financial incentives to

claims reviewers, by creating and implementing direct financial incentives to physicians and other health care professionals to deny coverage for medical services, and by the other practices detailed above. Defendants intended to and did provide coverage of lesser value than that represented to and purchased by ERISA Class Members. Defendants intended to retain and did retain the difference in value between the coverage described in Health Policies promised to and purchased by the ERISA Class and the coverage actually provided to the ERISA Class. Defendant thus fraudulently implemented the Health Policies for the benefit of Defendant and not for the benefit of ERISA Class Members.

108.    As participants in ERISA-governed Health Benefit Plans, Plaintiffs and the ERISA Class are entitled to appropriate equitable relief under section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3) to (a) redress the violations of section 404 of ERISA, 29 U.S.C. §1104, set forth herein, and (b) recover the amounts by which Humana has been unjustly enriched as a result of such violations.

109.    As participants in ERISA-governed Health Benefit Plans Plaintiffs and the ERISA Class are entitled appropriate relief under § 502(a)(2) of ERISA, 29 U.S.C. §1132(a)(2), including recovery of unjust enrichment, to redress violations of section 409 of ERISA, 29 U.S.C. §1109, to make good to such Plans any losses to the Plan resulting from each breach of fiduciary duty imposed by ERISA.

## XI.   COUNT FOUR

### Failure to Provide Benefits Due Under ERISA Plans
(Applicable to Members of the ERISA Class)

110.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

herein and further allege.

111.  Under the terms of their Benefit Plans, ERISA Class Members were entitled to a benefit consisting of coverage for Services described in the Humana Medical Necessity Definition. This coverage-benefit is distinct from individual claims for the payment of the medical losses incurred by ERISA Class Members. This coverage-benefit was of value to ERISA Class Members and was purchased by them, directly or indirectly, with their cash, salaries, and personal services. ERISA Class Members paid for the coverage-benefit whether or not they ever submitted claims for medical losses.

112.  As a result of the conduct and practices described in detail above, the coverage actually provided all ERISA Class Members under their Plans was different from the coverage indicated under the Humana Medical Necessity Definition set forth in the Disclosure Documents distributed to Members of the ERISA Class. ERISA Class Members purchased an ERISA-governed benefit – coverage for medically necessary services as described and defined in Humana Health Policies – which they were due under the terms of their Benefit Plans. Through the consistent and exclusive application of Undisclosed Cost-Based Criteria and the other conduct and practices described above, Humana denied all ERISA Class Members the coverage they had purchased and that was due under the terms of their Benefit Plans.

113.  Pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), ERISA Class Members are entitled to recover benefits due to them under the terms of their Plans and can enforce their rights under the terms of their Plans. The ERISA Class in this action is entitled to restitution of past coverage-benefits payments in an amount, to be determined at trial, equal to the difference between the value of the coverage-benefit purchased and the value of the coverage-

benefit actually provided.

## XII. COUNT FIVE
### Breach of Fiduciary Duty by Failure to
### Disclose Incentives Imposed on Physicians
(Applicable to Members of the ERISA Class)

114. In violation of its fiduciary duty to ERISA Class Members under §404 of ERISA, Humana has failed to disclose the financial incentives it provides to physicians that are intended to induce physicians to limit the amount of care they provide to their patients in Humana plans.

115. Unbeknownst to ERISA Class Members, Humana has created payment arrangements and direct financial incentives to treating physicians that encourage physicians to deny coverage to ERISA Class Members; to withhold medical services from ERISA Class Members; and to advise ERISA Class Members not to receive or seek medical services. These arrangements and incentives — which were never disclosed to ERISA Class Members — include, without limitation, "capitated payment" arrangements and "downcoding" practices. These incentives apply irrespective whether the medical services to be denied or withheld were medically advisable or consistent with the Medical Necessity Definition.

116. The existence of these financial incentives is material information. ERISA Class Members rely on physician advice with respect to treatment options. Because trust and openness are at the heart of the physician-patient relationship, patients have an interest in knowing whether any external financial incentives may apply to their physicians' advice.

117. By failing to disclose this material information, Humana breached its fiduciary duty to ERISA Class Members.

118. As participants and beneficiaries of ERISA-governed Health Benefit Plans,

Plaintiffs and the ERISA Class are entitled to restitutionary, injunctive and other appropriate equitable relief pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

## XIII. DEMAND FOR JURY TRIAL

119.    Plaintiffs demand a trial by jury on behalf of themselves and the Class.

WHEREFORE, plaintiffs, on behalf of the Classes, pray for judgment as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and that plaintiffs are proper representatives of the Classes;

b.    Awarding RICO Plaintiffs and RICO Class Members treble damages as a result of the wrongs alleged in the complaint;

c.    Awarding ERISA Plaintiffs and ERISA Class Members restitutionary relief for the wrongs alleged in the complaint;

d.    Awarding ERISA Plaintiffs and ERISA Class Members injunctive relief barring Humana from continuing the misrepresentations and omissions described herein;

e.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

f.    Awarding Plaintiffs and Class Members their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees;

g.    Award Plaintiffs and other Class Members such other and further relief as may be just and proper under the circumstances.

78

Respectfully submitted,

Anne E. Hinds
Florida Bar No. 0964972
BOIES & SCHILLER LLP
2435 Hollywood Boulevard
Hollywood, Florida 33020-6629
(954) 929-1190
Fax:  (954) 929-1185

Of Counsel:

Michael D. Hausfeld
Joseph M. Sellers
Margaret Q. Farrell
Donna Solen
COHEN, MILSTEIN,
HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
(202) 408-4600
Fax: (202) 408-4699

Theodore J. Leopold
RICCI, HUBBARD, LEOPOLD,
FRANKEL & FARMER PA
Mellon United National Bank Tower
1645 Palm Beach Lakes Boulevard
P.O. Box 2946
West Palm Beach, Florida 33402
(561) 684-6500
Fax: (561) 697-2383

David Boies
Stephen Neuwirth
William Savitt
BOIES & SCHILLER LLP
80 Business Park Drive, Suite 110
Armonk, New York 10504
(914) 273-9800
Fax: (914) 273-9810

Richard B. Drubel
BOIES & SCHILLER LLP
26 South Main Street
Hanover, NH  03755
(603) 643-9090
Fax: (603) 643-9010

Albert R. Huerta
HUERTA, HASTINGS & ALLISON
920 Leopard
P O. Box 23080
Corpus Christi, Texas 78403
Tel: (361) 884-1632
Fax:(361) 883-9092

Robert B. Silver
BOIES & SCHILLER LLP
80 Business Park Drive, Suite 110
Armonk, New York 10504
(914) 273-9800
Fax: (914) 273-9810

80

O

·· ·· ⸗··ᵍⁱᴱNT / EXHIBIT  4

## O'MELVENY & MYERS LLP

LOS ANGELES
CENTURY CITY
NEWPORT BEACH
NEW YORK
SAN FRANCISCO

**555 13th Street, N.W.**
**Washington, D.C. 20004-1109**
TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
INTERNET www.omm.com

HONG KONG
LONDON
SHANGHAI
TOKYO

January 28, 2000

OUR FILE NUMBER
404,625-0000

WRITER'S DIRECT DIAL
202-383-5263

WRITER'S E-MAIL ADDRESS
bboyle@omm com

### BY HAND DELIVERY

Mr. Michael Beck
Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
Room G-255, North Lobby
One Columbus Circle, N.E.
Washington, D.C. 20002

> Re: *In re Humana Inc. Managed Care Litigation -- MDL*
> *Docket No. 1334*
> *Notice of "Tag-Along" Actions*

Dear Mr. Beck

Pursuant to Rule 7.4(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, movants Humana, Inc. and Humana Health Plan, Inc. ("Humana") hereby notify the Panel of two new "tag-along" actions pending in the United States District Courts, which are related to the actions before this Panel as part of Humana's motion in *In re Humana Inc. Managed Care Litigation*, Docket No. 1334. These actions raise the same factual issues as the actions presently pending before the Panel and will require discovery of the same witnesses and documents as in those actions.

The first action is *Alan Weinger, Cynthia Zilka, and Clive D. Hayhurst on behalf of themselves and all others similarly situated v. Humana Inc.*, No. 99-9108-CIV-Ryskamp, which was filed in the Southern District of Florida, West Palm Beach Division, before the Hon. Kenneth L. Ryskamp, on December 30, 1999. A copy of the Class Action Complaint is attached to this letter at Tab A.

The second action is *Charles B. Shane, M.D., Jeffrey Book, D.O., P.A., Edward L. Davis D.O., and Hinsdale Orthopaedic Associates, S.C. v. Humana, Inc., Humana Health Plan, Inc. and Humana Insurance Company*, No. 3:00-CV-53-5, which was brought in the Jefferson County Circuit Court, Commonwealth of Kentucky Court of Justice, on January 6, 2000, and timely removed to the Western District of Kentucky, Louisville Division, before the Hon. Charles W. Simpson on January 28, 2000. Copies of the Class Action Complaint and the Notice of Removal are attached to this letter at Tab B

O'MELVENY & MYERS LLP

Mr. Michael Beck, January 28, 2000 - Page 2

     The undersigned counsel represents all defendants in the above-referenced actions, including Humana Insurance Company, which is not a named defendant in any of the actions identified to the Panel. Humana respectfully requests that, if the Panel consolidates the actions before it on the pending motion, it also issue an order pursuant to Rule 7.4(a) conditionally transferring these tag-along actions to the same transferee court.

     If you have any questions, please do not hesitate to call me at the above telephone number.

                          Sincerely,

                          Brian D. Boyle

                          of O'MELVENY & MYERS LLP

BDB:psh

Enclosures

cc:    All MDL Counsel of Record (w/o Encl.)

DC1:420-9981
01/28/00

## CERTIFICATE OF SERVICE

I hereby certify that Defendants Humana Inc. and Humana Health Plan Inc.'s Reply Memorandum in Support of Motion to Transfer and Consolidate for Pretrial Proceedings was mailed, postage pre-paid, on January 28, 2000, to:

David Boies, Esq.
Boies & Schiller LLP
80 Business Park Drive
Suite 110
Armonk, NY 10504

Steven Fineman, Esq.
Leiff, Cabraser, Heimann & Bernstein
10 Rockefeller Plaza
12th Floor
New York, NY 10020-1903

Mark K. Gray, Esq.
O'Koon, Gray & Weiss
1400 Citizens Plaza
500 W. Jefferson Street
Louisville, KY 40202

Stephen Neuwirth, Esq.
Boies & Schiller
80 Business Park Drive
Suite 110
Armonk, NY 10504

H. Laddie Montague, Jr., Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

David Krathen, Esq.
David Krathen, P.A.
888 East Las Olas Blvd
Suite 200
Ft. Lauderdale, FL 33301

Joseph C. Langston, Esq.
Langston, Langston,
 Michael, Bowen & Tucker
100 South Main Street
PO Box 787
Booneville, MS 38829

Andrew Peretz, Esq.
Barrett, Gravante, Carpinello
 & Stern
One East Broward Blvd.
Suite 620
Ft. Lauderdale, FL 33301

David Deep, Esq.
Deep & Womack
PO Box 50
Henderson, KY 42420

James W. Beasley, Jr., Esq.
Beasley, Leacock & Hauser, P.A.
Flagler Center, Suite 1400
505 South Flagler Drive
West Palm Beach, FL 33401

_____
Paul S. Horwitz
Law Clerk
O'Melveny & Myers LLP

Counsel for Defendant Humana Inc.,
Humana Health Plan Inc. and Humana
Insurance Co.

DC1 420691 1
01/28/00

ATTACHMENT / EXHIBIT *5*

# O'MELVENY & MYERS LLP

LOS ANGELES
CENTURY CITY
NEWPORT BEACH
NEW YORK
SAN FRANCISCO

555 13th Street, N.W.
Washington, D.C. 20004-1109

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
INTERNET: www.omm.com

HONG KONG
LONDON
SHANGHAI
TOKYO

February 8, 2000

OUR FILE NUMBER
404,625-035

WRITER'S DIRECT DIAL
202-383-5263

WRITER'S E-MAIL ADDRESS
bboyle@omm.com

**VIA HAND DELIVERY**
Mr. Michael Beck
Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
Room G-255, North Lobby
One Columbus Circle, N.E.
Washington, D.C. 20002

> Re: *In re Humana Inc. Managed Care Litigation – MDL Docket No. 1334*
> *Notice of "Tag-Along" Actions*

Dear Mr. Beck:

Pursuant to Rule 13(e) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Humana Inc. ("Humana") hereby notifies the Panel of seven potential "tag-along actions" that are appropriate for consolidation with other related actions pursuant to Humana's motion under MDL No. 1334. These potential tag-along actions, which are detailed in the schedule attached at Tab A, raise the same claims and identify the same purported classes as do the actions that were the original subject of MDL No. 1334. Indeed, the complaints in all of these cases are virtual carbon copies of complaints already filed against Humana. Three of the seven potential tag-along actions were filed by the same lawyers who filed *Messina v. Humana Inc.*, No. 99-3309-CIV-Davis (S.D. Fla.) – an action that was originally proposed for consolidation in MDL No. 1334 – and lawyers at a separate firm filed each of the other four actions.

All seven complaints were filed in the Southern District of Florida, where two of the four actions originally proposed for consolidation were filed. Like at least one other purported class action that was filed there after Humana and Humana Health Plan, Inc., filed their motion in MDL No. 1334, these latest duplicate filings represent a transparent attempt to influence both the Panel's selection of a transferee forum and the eventual MDL transferee judge's construction of a plaintiffs' steering committee for management of the litigation. They also present troubling

O'MELVENY & MYERS LLP

Mr. Michael Beck, February 8, 2000 - Page 2

questions under 28 U.S.C. § 1927 (providing for awards of fees and costs against lawyers who "multipl[y] the proceedings in any case unreasonably and vexatiously"). As nearly identical copies of the original actions proposed for transfer in MDL No. 1334, nevertheless, there is no question but that they should be consolidated along with the others.

Very truly yours,

Brian D. Boyle
of O'MELVENY & MYERS LLP

Encls.

## CERTIFICATE OF SERVICE

I hereby certify that Defendant Humana Inc.'s Notice of "Tag-Along" Actions, together with the attachments thereto, was mailed, postage pre-paid, on February 8, 2000, to:

David Boies, Esq.
Boies & Schiller LLP
80 Business Park Drive
Suite 110
Armonk, NY 10504

Steven Fineman, Esq.
Lieff, Cabraser, Heimann & Bernstein
10 Rockefeller Plaza
12th Floor
New York, NY 10020-1903

Mark K. Gray, Esq.
O'Koon, Gray & Weiss
1400 Citizens Plaza
500 W. Jefferson Street
Louisville, KY 40202

Stephen Neuwirth, Esq.
Boies & Schiller
80 Business Park Drive
Suite 110
Armonk, NY 10504

H. Laddie Montague, Jr., Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

Greg A. Lewen
Miller, Schwartz & Miller, PA
PO Box 7259
Hollywood, FL 33081-1259

David Krathen, Esq.
David Krathen, PA
888 East Las Olas Blvd.
Suite 200
Ft. Lauderdale, FL 33301

Joseph C. Langston, Esq.
Langston, Langston,
Michael, Bowen & Tucker
100 South Main Street
PO Box 787
Booneville, MS 38829

Andrew Peretz, Esq.
Barrett, Gravante, Carpinello
& Stern
One East Broward Blvd.
Suite 620
Ft. Lauderdale, FL 33301

David Deep, Esq.
Deep & Womack
PO Box 50
Henderson, KY 42420

James W. Beasley, Jr., Esq.
Beasley, Leacock & Hauser, P.A.
Flagler Center, Suite 1400
505 South Flagler Drive
West Palm Beach, FL 33401

_Joanne V. Moses_

Joanne V. Moses
Legal Assistant
O'Melveny & Myers LLP

Counsel for Defendant Humana Inc.,
Humana Health Plan Inc. and Humana
Insurance Co.

DC1 421758 1
02 8 00

A

## SCHEDULE OF POTENTIAL "TAG-ALONG ACTIONS"

1.   *Lewen v. Humana Inc.*, No. 00-6130-CIV-Ferguson (S.D. Fla.) (Tab 1). *Lewen* was filed
     on January 27, 2000, and provided to Humana Inc. ("Humana") via U.S. Mail on or about
     January 28, 2000, together with an agreement for waiver of service.   On behalf of a
     purported nationwide class of persons enrolled in Humana-sponsored health maintenance
     organizations ("HMOs"), preferred provider organizations ("PPOs"), or point-of-service
     plans ("POSs") at any time since October 4, 1995 (four years before the complaint in
     *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's use of certain
     alleged cost-containment measures constituted a violation of the Racketeer Influenced
     and Corrupt Organizations Act ("RICO").   On behalf of a purported nationwide subclass
     of Humana subcribers at any time since October 4, 1993 (six years before the complaint
     in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged
     practices violated the Employee Retirement Income Security Act ("ERISA").   The named
     plaintiff is represented by Barrett Gravante Carpinello & Stern, Ft. Lauderdale, Florida,
     who also serve as counsel to the named plaintiff in *Messina v. Humana Inc.*

2.   *Berrios v. Humana Inc.*, No. 00-6131-CIV-Zloch (S.D. Fla.) (Tab 2). *Berrios* was filed
     on January 27, 2000, and provided to Humana via U.S. Mail on or about January 28,
     2000, together with an agreement for waiver of service.   On behalf of a purported
     nationwide class of persons enrolled in Humana-sponsored HMOs, PPOs, or POSs at any
     time since October 4, 1995 (four years before the complaint in *Price v. Humana Inc.* was
     filed), the named plaintiff asserts that Humana's use of certain alleged cost-containment
     measures constituted a violation of RICO.   On behalf of a purported nationwide subclass
     of Humana subcribers at any time since October 4, 1993 (six years before the complaint
     in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged
     practices violated ERISA.   The named plaintiff is represented by Barrett Gravante
     Carpinello & Stern, Ft. Lauderdale, Florida, who also serve as counsel to the named
     plaintiff in *Messina v. Humana Inc.*

3    *Rothman v. Humana Inc.*, No. 00-6132-CIV-Gold (S.D. Fla.) (Tab 3). *Rothman* was filed
     on January 27, 2000, and provided to Humana via U.S. Mail on or about January 28,
     2000, together with an agreement for waiver of service.   On behalf of a purported
     nationwide class of persons enrolled in Humana-sponsored HMOs, PPOs, or POSs at any
     time since October 4, 1995 (four years before the complaint in *Price v. Humana Inc.* was
     filed), the named plaintiff asserts that Humana's use of certain alleged cost-containment
     measures constituted a violation of RICO.   On behalf of a purported nationwide subclass
     of Humana subcribers at any time since October 4, 1993 (six years before the complaint
     in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged
     practices violated ERISA.   The named plaintiff is represented by Barrett Gravante
     Carpinello & Stern, Ft. Lauderdale, Florida, who also serve as counsel to the named
     plaintiff in *Messina v. Humana Inc.*

4.   *Guesby v. Humana Inc.*, No. 00-6136-CIV-Zloch (S.D. Fla.) (Tab 4). *Guesby* was filed
     on January 28, 2000, and served on Humana on February 1, 2000. On behalf of a

purported nationwide class of persons enrolled in Humana-sponsored HMOs, PPOs, or POSs at any time since October 4, 1995 (four years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's use of certain alleged cost-containment measures constituted a violation of RICO. On behalf of a purported nationwide subclass of Humana subcribers at any time since October 4, 1993 (six years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged practices violated ERISA. The named plaintiff is represented by Miller, Schwartz, & Miller, P.A., Hollywood, Florida.

5.    *Lewinsohn v. Humana Inc.*, No. OO-6138-CIV-Moore (S.D. Fla.) (Tab 5). *Lewinsohn* was filed on January 28, 2000, and served on Humana Inc. ("Humana") on February 1, 2000. On behalf of a purported nationwide class of persons enrolled in Humana-sponsored health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), or point-of-service plans ("POSs") at any time since October 4, 1995 (four years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's use of certain alleged cost-containment measures constituted a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). On behalf of a purported nationwide subclass of Humana subcribers at any time since October 4, 1993 (six years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged practices violated the Employee Retirement Income Security Act ("ERISA"). The named plaintiff is represented by Miller, Schwartz, & Miller, P.A., Hollywood, Florida.

6.    *Colin v. Humana Inc.*, No. 00-6139-CIV-Ferguson (S.D. Fla.) (Tab 6). *Colin* was filed on January 28, 2000, and served on Humana on February 1, 2000. On behalf of a purported nationwide class of persons enrolled in Humana-sponsored HMOs, PPOs, or POSs at any time since October 4, 1995 (four years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's use of certain alleged cost-containment measures constituted a violation of RICO. On behalf of a purported nationwide subclass of Humana subcribers at any time since October 4, 1993 (six years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged practices violated ERISA. The named plaintiff is represented by Miller, Schwartz, & Miller, P.A., Hollywood, Florida.

7.    *Smart v. Humana Inc.*, No. 00-6140-CIV-Ungaro-Benages (S.D. Fla.) (Tab 7). *Smart* was filed on January 28, 2000, and served on Humana on February 1, 2000. On behalf of a purported nationwide class of persons enrolled in Humana-sponsored HMOs, PPOs, or POSs at any time since October 4, 1995 (four years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's use of certain alleged cost-containment measures constituted a violation of RICO. On behalf of a purported nationwide subclass of Humana subcribers at any time since October 4, 1993 (six years before the complaint in *Price v. Humana Inc.* was filed), the named plaintiff asserts that Humana's alleged practices violated ERISA. The named plaintiff is represented by Miller, Schwartz, & Miller, P.A., Hollywood, Florida.



# O'MELVENY & MYERS LLP



ATTACHMENT / EXHIBIT ___

| | | |
|---|---|---|
| LOS ANGELES | 555 13th Street, N.W. | HONG KONG |
| CENTURY CITY | Washington, D.C. 20004-1109 | LONDON |
| NEWPORT BEACH | | SHANGHAI |
| NEW YORK | TELEPHONE (202) 383-5300 | TOKYO |
| SAN FRANCISCO | FACSIMILE (202) 383-5414 | |
| | INTERNET: www.omm.com | |

March 15, 2000

OUR FILE NUMBER
404,625-035

WRITER'S DIRECT DIAL
202-383-5127

**VIA HAND DELIVERY**

Mr. Michael Beck
Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
Room G-255, North Lobby
One Columbus Circle, N.E.
Washington, D.C. 20002

WRITER'S E-MAIL ADDRESS
bbrooks@omm.com

Re: *In re Humana Inc. Managed Care Litigation – MDL
Docket No. 1334
Notice of "Tag-Along" Actions*

Dear Mr. Beck:

Pursuant to Rule 13(e) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Humana Inc. ("Humana") hereby notifies the Panel of two potential "tag-along actions" that are appropriate for consolidation with other related actions pursuant to Humana's motion under MDL No. 1334. These potential tag-along actions are *Cutler, et al. v. Humana Medical Plan, Inc., et al.*, Case No. 00-6301-Civ-Gold, and *Landa, et al. v. Humana Medical Plan, Inc., et al.*, Case No. 00-6217-Civ-Graham. Copies of the complaints in each action are attached at Tabs 1 and 2.

In the *Cutler* action, two named plaintiffs – an individual physician, acting on his own behalf, and the Broward County Medical Association, purportedly acting on behalf of its members – assert that (1) various Humana affiliates have engaged in alleged "downcoding" of physician claims for payment, and that (2) Humana affiliates have implemented certain cost-containment incentives, such as capitation, that allegedly limit the ability of patients to see the specialist of their choice. While *Cutler* is brought by physicians rather than Humana insureds, *Cutler* clearly raises issues that are closely related to the issues involved in actions previously identified by Humana as appropriate for transfer and consolidation. For example, allegations concerning alleged "downcoding" and physician incentives (like capitation) are at the heart of these previously identified cases. (*See, e.g., Price v. Humana Inc.*, Compl. ¶¶ 30(g) (identifying

O'MELVENY & MYERS LLP
Mr. Michael Beck, March 15, 2000 - Page 2

Humana's use of capitation as an allegedly common question of fact for class certification purposes), 51(e)(iii) (alleging that Humana engaged in "downcoding").)

In the *Landa* action, two named plaintiffs – an individual physician, acting on his own behalf, and the Broward County Medical Association, purportedly acting on behalf of its members – assert that various Humana affiliates have engaged in alleged "downcoding" of physician claims for payment. In this respect, *Landa* appears to be identical to *Cutler*, and relates to the actions previously identified to the Panel in that it raises the same alleged "downcoding" issues implicated in such actions.

Both *Cutler* and *Landa* were filed by the same attorneys. Each action involves both an individual named plaintiff (a physician) and a purportedly representative plaintiff (a local medical association). Each action further involves factual allegations central to the actions previously identified to the Panel by Humana as appropriate for transfer and consolidation. There is thus no question but that they should be consolidated along with the others.

Very truly yours,

Brian P. Brooks

Encls.

cc:    All MDL Counsel of Record
DC1:425863.1
03/15/00

## CERTIFICATE OF SERVICE

I hereby certify that Defendant Humana Inc.'s Notice of "Tag-Along" Actions, together with the attachments thereto, was mailed, postage pre-paid, on March 15, 2000, to:

David Boies, Esq.
Boies & Schiller LLP
80 Business Park Drive
Suite 110
Armonk, NY  10504

Steven Fineman, Esq.
Lieff, Cabraser, Heimann & Bernstein
10 Rockefeller Plaza
12th Floor
New York, NY  10020-1903

Mark K. Gray, Esq.
O'Koon, Gray & Weiss
1400 Citizens Plaza
500 W. Jefferson Street
Louisville, KY  40202

Stephen Neuwirth, Esq.
Boies & Schiller
80 Business Park Drive
Suite 110
Armonk, NY  10504

H. Laddie Montague, Jr., Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103-6365

Greg A. Lewen, Esq.
Miller, Schwartz & Miller, PA
2435 Hollywood Blvd.
Hollywood, FL 33020

David Krathen, Esq.
David Krathen, PA
888 East Las Olas Blvd.
Suite 200
Ft. Lauderdale, FL  33301

Joseph C. Langston, Esq.
Langston, Langston, Michael, Bowen & Tucker
100 South Main Street
Booneville, MS  38829

Andrew Peretz, Esq.
Barrett, Gravante, Carpinello & Stern
One East Broward Blvd.
Suite 620
Ft. Lauderdale, FL  33301

David Deep, Esq.
Deep & Womack
790 Bob Posey Street
Henderson, KY  42420

James W. Beasley, Jr., Esq.
Beasley, Leacock & Hauser, P.A.
Flagler Center, Suite 1400
505 South Flagler Drive
West Palm Beach, FL  33401

Walter G. Campbell, Jr. Esq.
Krupnick, Campbell, Malone, Roselli, Buser,
Slama, Hancock, McNelis, Liberman & McKee
700 Southeast Third Avenue
Courthouse Law Plaza
Suite 100
Fort Lauderdale, FL 33316

Joanne V. Moses

_____
Joanne V. Moses

ATTACHMENT / EXHIBIT 7

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    SANDRA JOHNSON, individually and      )   No. 99 C 7602
      on behalf of all those similarly      )
 4    situated,                             )
                                            )
 5                        Plaintiff,        )
                                            )
 6         vs.                              )   Chicago, Illinois
                                            )   January 25, 2000
 7    HUMANA, INC., a Delaware              )   9:3 o'clock a.m.
      corporation,                          )
 8                                          )
                          Defendant.        )
 9

10                 TRANSCRIPT OF PROCEEDINGS - MOTION
                   BEFORE THE HON. MARVIN E. ASPEN
11

12    APPEARANCES:

13    For the Plaintiff:        MUCH SHELIST FREED DENENBERG
                                AMENT BELL & RUBENSTEIN PC
14                              BY:  MR. MICHAEL B. HYMAN
                                220 North LaSalle Street
15                              Chicago, Illinois 60601

16    For the Defendant:        O'MELVENY & MYERS LLP
                                BY:  MR. IRA RAPHAELSON and
17                                   MR. BRIAN P. BROOKS
                                555 13th Street, N.W.
18                              Washington, D.C. 20004

19                              UNGARETTI & HARRIS
                                BY:  MR. JAMES G. RICHMOND
20                              3500 Three First National Plaza
                                Chicago, Illinois 60602
21
      Court Reporter:           MARY M. HACKER
22                              Official Court Reporter
                                219 South Dearborn Street, Suite 2528A
23                              Chicago, Illinois 60604
                                (312) 663-0049
24                              _____

25
```

2

1          THE CLERK:  99 C 7602, Sandra Johnson versus Humana,

2    Inc.

3          MR. HYMAN:  Good morning.  Michael Hyman for the

4    plaintiff.

5          THE COURT:  Good morning.

6          MR. RICHMOND:  Good morning, your Honor.  James

7    Richmond of Ungaretti & Harris for the Defendant Humana, with

8    Mr. Ira Raphaelson of O'Melveny & Myers, and Mr. Brian Brooks

9    of the same firm.

10         THE COURT:  Your motions for admission pro hac vice

11   and for leave to file additional appearances are allowed.

12         MR. RAPHAELSON:  Thank you, your Honor.

13         THE COURT:  There is a motion for a stay pending the

14   motion to transfer and consolidate.  That's before the Multi

15   District Litigation Panel?

16         MR. HYMAN:  Your Honor, this week we filed a response

17   in which we asked that the case be sent before your Honor as

18   our first choice, or before the Court of Mississippi or in

19   Florida.

20         We had stipulated about a month ago for an answer or

21   otherwise plead to the complaint by this coming Thursday, and

22   then they filed this motion for a stay.  We would ask that the

23   defendant respond to the complaint as stipulated by Thursday

24   and that we get seven days to respond to the motion on the

25   stay.

1          MR. RAPHAELSON:  Judge, good morning.

2          There are a number of developments that I think the

3     Court might find of interest that have occurred since we filed

4     our motion.

5          As Mr. Hyman indicated, they have essentially joined

6     in our MDL request for consolidation arguing for this venue.

7     Two other groups of plaintiff's counsel, one in Florida, led by

8     Mr. Bois and his firm in the Price matter, have argued for

9     consolidation and their own venue, Mr. Bois also invoking the

10    first in time rule.

11         Mr. Scruggs, in the Landrey matter pending before

12    Judge Pickering, moved for consolidation as well there, urging

13    his venue, as well as moving for a stay when Judge Pickering on

14    his own motion, having noticed the MDL petition filed by

15    Humana, suspended proceedings not only in the Humana matter but

16    in all of the various HMO cases down there.  I believe there

17    could be as many as eleven pending before Judge Pickering

18    against various defendants, including Humana.

19         Two other cases have been filed against Humana which

20    will figure -- well, one of which will certainly figure in the

21    MDL, one of which may, the first being Weinger versus Humana,

22    which has been assigned to Judge Ricecamp in southern Florida,

23    bringing three cases in Florida on the same essential theory.

24    The Weinger case is brought by the Berger and Montague firm out

25    of Philadelphia, which also brought the earlier mail case

4

1    against Aetna, which had a similar iteration of theory, was

2    dismissed by the Federal District Court in Philadelphia and is

3    now pending in the Third Circuit.

4            The second case is a Kentucky state case filed in

5    Louisville, where Humana is headquartered; it is on the

6    doctors' aspect of the case.  Humana is considering attempting

7    to remove that case and also referring that to the MDL panel

8    for consolidation.

9            One other element that ought -- or perhaps might be of

10    interest to the Court is the Fifth Circuit decided the Elman

11    (phonetic) versus Kaiser Foundation case.  The essential

12    holding of that case was the Fifth Circuit found there is no

13    ERISA based fiduciary obligation to disclose capitation

14    agreements, one of the court theories of the Johnson-Price and

15    other actions against Humana.

16            I note this not to address the matter on the merits,

17    your Honor, but because it underscores the observation that the

18    plaintiffs in the Johnson case made in the MDL panel, which is

19    that part of the reason for moving ahead with the MDL is that

20    one ought to avoid the potential for wasteful litigation and

21    potentially conflicting rulings.

22            Elman is binding, for instance, on Judge Pickering.

23    It is obviously something we will argue should be persuasive to

24    this Court but is not binding --

25            THE COURT:  Okay.  Well, argue it at the appropriate

01/28/00    11:25

5

1    time then.

2            MR. RAPHAELSON:  Judge, we think a stay is

3    appropriate.  Judge Pickering has, though not ruled for a stay,

4    certainly acted as though he thinks one is appropriate.  The

5    plaintiffs in that matter have joined the effort for stay.  The

6    MDL panel is going to be hearing our motion the end of March

7    and we expect a ruling the beginning of April.

8            We respectfully request that the Court grant our stay.

9    It's a limited amount of time, and we will know what the MDL

10   panel does then.

11           THE COURT:  How are you going to be prejudiced if I

12   grant the stay?

13           MR. HYMAN:  I think that, first of all, the fact that

14   we are asking that the case be sent here, I think is important

15   that the case continue here.

16           THE COURT:  I would love to have it here, but the fact

17   that you're asking for it here doesn't mean it's going to be

18   here.

19           MR. HYMAN:  That's true, your Honor.  But there is no

20   reason to stay it in that the filing of an MDL petition does

21   not automatically stay a case.  It's in your discretion.

22           THE COURT:  Sure.

23           MR. HYMAN:  But why should we wait until April or

24   whenever the MDL panel rules?  There isn't going to be a lot

25   happening in the meantime but at least we are going to get

6

1    their response on file, we can begin the motion papers.  They

2    are already arguing the merits of that --

3              THE COURT:  I think the response ought to get on file

4    because you're going to file a response no matter where the

5    case is, right?

6              In terms of discovery I think it makes sense, in terms

7    of the motion practice it makes sense to wait and see if the

8    cases are going to be consolidated.  But in terms of filing a

9    responsive pleading, you're going to have to file a responsive

10   pleading in all these cases.

11             MR. RAPHAELSON:  Judge, we filed a responsive pleading

12   in the Price case because that one --

13             THE COURT:  File one here then.

14             MR. HYMAN:  -- was filed well in advance of the other

15   cases which have followed since.

16             We will obviously do what the Court directs us to do.

17             THE COURT:  All right.  I am going to ask that you

18   file your responsive pleading as required, and I will stay any

19   motions or discovery until we find out what is happening in

20   terms of the motion before the MDL panel.

21             MR. RAPHAELSON:  Judge, given that we had noticed the

22   motion for stay on the 11th, hoping to get into court last

23   week, we are here today, we are due on Thursday, our offices

24   are closed today because of a snowstorm -- could we have until

25   Monday?

7

1          THE COURT:  Yes.

2          MR. HYMAN:  I have no objection.

3          THE COURT:  Okay.

4          MR. RAPHAELSON:  Thank you.

5          THE COURT:  You're welcome.

6     (Which were all the proceedings had at the hearing of

7     the within cause on the day and date hereof.)

8                    CERTIFICATE

9          I HEREBY CERTIFY that the foregoing is a true,

10    correct and complete transcript of the proceedings had at the

11    hearing of the aforementioned cause on the day and date hereof.

12

13

14    _____                    1/20/00
      Official Court Reporter                     Date
15    U.S. District Court
      Northern District of Illinois
16    Eastern Division

17

18

19

20

21

22

23

24

25



01/27/00  15:26  FAX 601 336 7731          MCGLINCHEY STAFFORD

ATTACHMENT / EXHIBIT   8

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JAN 25 2000

AT NEW UN [ ] CLERK
BY _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

| | |
|---|---|
| **LANDRY** | **PLAINTIFF** |
| **VERSUS** | **CIVIL ACTION NO. 2:99-cv-325PG** |
| **HUMANA, ET AL** | **DEFENDANT** |

## ORDER

This matter is before the Court sua sponte.  This Court had previously advised the parties herein that a motion to transfer this case to multi-district litigation had been filed.  In light of that, the Court had requested responses from counsel for all of the parties regarding continued development of this case in this Court.

The Court has received the responses that it requested and has reviewed all of them.  The Court has determined that it would not be able to make any constructive progress in resolving this litigation while the motion to transfer this case to the MDL panel is pending especially since the Plaintiffs in their response to that motion have requested that all of the cases pending before this Court be transferred as tag-along cases.

The Court has therefore determined that the interests of justice and judicial economy require the Court to stay this matter pending resolution of the motion to transfer this case to the multi-district litigation panel as well as this case as a tag along.  The Court would advise the parties that as soon as a decision is made by the multi-district litigation panel as to whether this case goes to that panel or stays in this Court

or whether this case comes back to this Court, this Court will conduct a conference to schedule this matter for speedy resolution.

IT IS, THEREFORE, ORDERED AND ADJUDGED that this case is stayed pending further order of this Court.

IT IS FURTHER ORDERED AND ADJUDGED that any conferences scheduled in this case are hereby canceled until further order of the Court

SO ORDERED AND ADJUDGED, this the _23rd_ day of _January_, 2000.

CHARLES W. PICKERING, SR.
UNITED STATES DISTRICT JUDGE



FILED by _____ D.C.

MAR 1 5 2000

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH**

Case No. 99-9108-CIV-RYSKAMP   ᴬᵀᵀᴬCHMENT / EXHIBIT ___

ALAN WEINGER, CYNTHIA ZILKA
and CLIVE D. HAYHURST on behalf
of themselves and all others
similarly situated,

      Plaintiffs,

vs.

HUMANA INC.,

      Defendant.

_____/

## ORDER GRANTING STAY OF PROCEEDINGS

THIS CAUSE came before the Court upon the defendant's notice that it recently filed a

motion to the Judicial Panel on Multidistrict Litigation for an order of transfer and an order of

consolidation [DE 12 & 14], filed March 7, 2000.

In the interest of justice and judicial economy, this Court shall stay the above-styled

matter pending resolution of the motion to transfer this case to the multi-district litigation panel.

The parties shall keep the Court informed on this matter.

ORDERED AND ADJUDGED that proceedings will be **STAYED** pending further order

of this Court.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this _13_ day of

March, 2000.

          _[signature]_

          KENNETH L. RYSKAMP
          UNITED STATES DISTRICT JUDGE

15
K2

Page 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

copies provided:
Brian Brooks, Esq.
David Krathen, Esq.
H. Laddie Montague, Jr., Esq.
James W. Beasley, Jr., Esq.
Peter A. Sachs, Esq.